Rene L. Valladares
Federal Public Defender
Nevada State Bar No. 11479
*Ron Sung
Assistant Federal Public Defender
Nevada Bar No. 13047
411 E. Bonneville Ave., Ste. 250
Las Vegas, Nevada 89101
(702) 388-6577
Ron_Sung@fd.org


*Attorney for Petitioner Travis Sheffield


# United States District Court
# District of Nevada

Travis Sheffield,

       Petitioner,

    v.

State of Nevada,

       Respondent.

Case No. 2:22-cv-00584-GMN-NJK

**Second Amended Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254**

INTRODUCTION

Petitioner Travis Sheffield stands convicted for the murder of Jonathan Collins, a deaf poker player. The State, however, presented no physical evidence tying Sheffield to the crime. The State instead relied on the identifications of three witnesses, each less reliable than the other. In comparison, Sheffield had an alibi. Sheffield maintains his innocence and files this petition for writ of habeas corpus under 28 U.S.C. § 2254 to overturn his conviction.

PROCEDURAL HISTORY

## A.    Three unreliable witnesses accuse Sheffield.

On May 11, 2015, decedent Jonathan Collins was shot and killed in a vehicle in the parking lot of the apartment complex in Las Vegas, Nevada. Earlier in the day, Collins and his girlfriend Julie Kniesl had just arrived in Las Vegas with thousands of dollars to buy drugs.[1] Notably, both Collins and Kniesl are deaf.[2]

They met up with Collins's friend Rufus "Richard or Rich" Smith, who acted as a middleman.[3] Collins communicated with Smith via hand-written notes.[4] Smith took them to meet with two unnamed black males at an apartment complex.[5] Collins wasn't satisfied was the quality of the drugs,[6] so Smith then took to them to another dealer at the second apartment complex.[7] There Smith helps Collins and Kniesl buy crack.[8]

---

[1] 3/20/2018 Jury Trial Day 4 at 7-10, 27.

[2] 3/20/2018 Jury Trial Day 4 at 41.

[3] 3/20/2018 Jury Trial Day 4 at 9-11.

[4] 3/20/2018 Jury Trial Day 4 at 15.

[5] 3/20/2018 Jury Trial Day 4 at 12.

[6] 3/20/2018 Jury Trial Day 4 at 14.

[7] 3/20/2018 Jury Trial Day 4 at 16.

[8] 3/20/2018 Jury Trial Day 4 at 15-17.

After the drug transaction, Smith returned to the car with one of the unnamed black males from the first apartment complex.[9] The four—Collins, Kniesl, Smith, and the unnamed black male—then drove to a third apartment complex.[10] There, at the apartment complex parking lot, Smith exited the car and gestured for Collins to wait for him.[11] Minutes later, the unnamed black male, seated in the rear passenger seat, pointed a gun at Collins in the driver seat and gestured a demand for money.[12] Collins opened the door, but the unnamed black male pulled Collins from behind the seat.[13] The unnamed black male then shot and killed Collins.[14]

Kniesl, who was in the front passenger seat, alleged a second unidentified black male entered the car after Smith left but before the shooting.[15] The two unnamed black males in the backseat had a brief exchange after the shooting.[16] After the shooting, the two unnamed black males fled in opposite directions.[17] This second black male remains unidentified to this day. Police found $7,880 in a duffel bag inside the trunk.[18] Kniesl still had $800 in her purse.[19]

---

[9] 3/20/2018 Jury Trial Day 4 at 18.

[10] 3/20/2018 Jury Trial Day 4 at 20.

[11] 3/20/2018 Jury Trial Day 4 at 23.

[12] 3/20/2018 Jury Trial Day 4 at 25-27

[13] 3/20/2018 Jury Trial Day 4 at 27-28.

[14] 3/20/2018 Jury Trial Day 4 at 28.

[15] 3/20/2018 Jury Trial Day 4 at 32, 51-52, 54.

[16] 3/20/2018 Jury Trial Day 4 at 30.

[17] 3/20/2018 Jury Trial Day 4 at 32.

[18] 3/19/2018 Jury Trial Day 3 at 119. Kniesl testified there was $8,000 in the trunk. 3/20/2018 Jury Trial Day 4 at 27.

[19] 3/20/2018 Jury Trial Day 4 at 27.

The State charged Rufus Smith with murder, first-degree kidnapping, and two counts of attempted sale of controlled substance on May 28, 2015.[20] Police apprehended Smith soon after on June 4, 2015.[21] In his voluntary statement, Smith stated he didn't know the identity of the shooter.[22] Smith also alleged that at the third apartment complex, the shooter pulled out his gun, took Smith's cell phone, and ordered Smith out of the car.[23] Kniesl testified against Smith at his preliminary hearing on August 27, 2015.[24] Kniesl contradicted Smith's testimony: Smith exited the car before the shooting.[25]

The identity of the shooter remained unknown.[26] Smith was bound over to the Eighth Judicial District Court on November 3, 2015.[27]

Then, out of the blue, on December 16, 2015, Orlando Thompson provided a voluntary statement to police identifying the shooter.[28] Rufus Smith was Thompson's drug dealer.[29] Between the death of Collins and Smith's arrest, Thompson met up with Smith to buy drugs where he noticed Smith was shaking.[30] Smith explained "I fucked up, you know, I'm going to run until I get caught or until everybody else—

---

[20] 5/28/2015 Criminal Complaint, State v. Rufus Smith (15F08000X).

[21] Exh. 31: 6/4/2015 Voluntary Statement of Rufus Smith.

[22] Exh. 31: 6/4/2015 Voluntary Statement of Rufus Smith at 7.

[23] Exh. 31: 6/4/2015 Voluntary Statement of Rufus Smith at 7, 25, 27.

[24] 8/5/2015 Preliminary Hearing, State v. Rufus Smith (15F08000X).

[25] 8/27/2015 Preliminary Hearing, State v. Rufus Smith (15F08000X) at 42.

[26] 8/5/2015 Preliminary Hearing, State v. Rufus Smith (15F08000X) at 47 (page 185).

[27] 11/3/2015 Bindover, State v. Rufus Smith (C-15-310494-1).

[28] Exh. 42: 12/16/2016 Voluntary Statement of Orlando Thompson at 3.

[29] 3/21/2018 Jury Trial Day 5 at 17.

[30] 3/21/2018 Jury Trial Day 5 at 18.

until they catch everybody else."[31] After his arrest, Smith called Thompson from jail and asked Thompson to facilitate three-way calls on more than one occasion to Smith's girlfriend, Red.[32] After helping facilitate the three-way calls, Red and a person Thompson knew as Snake began to appear at Thompson's home looking to buy weed.[33] Thompson testified this was "weird" because Thompson had just delivered weed to Red per Smith's request; neither Red nor Snake had ever bought weed from Thompson before.[34] Thompson became suspicious and googled Rufus Smith, finding articles about the murder of a deaf poker player in Las Vegas.[35] Thompson heard rumors Red snitched on Smith and Snake was involved in the murder.[36] Thompson allegedly became so concerned for his safety that he moved out of his apartment in August 2015.[37]

Sometime in October 2015, Thompson saw Snake's uncle (unnamed) at his apartment complex and asked him for a ride to pick up his car from the repair shop, Delta Auto Care.[38] Along the way, Snake's uncle picked up Snake.[39] During this car ride, Snake asked Thompson about the three-way calls with Smith.[40] Snake then allegedly confessed he "went to hit a lick for eight or nine racks, and that it went bad"

---

[31] 3/21/2018 Jury Trial Day 5 at 18.

[32] 3/21/2018 Jury Trial Day 5 at 18-19.

[33] 3/21/2018 Jury Trial Day 5 at 23-24; 3/21/2018 Jury Trial Day 5 at 40.

[34] 3/21/2018 Jury Trial Day 5 at 23-24.

[35] 3/21/2018 Jury Trial Day 5 at 25.

[36] 3/21/2018 Jury Trial Day 5 at 28-29.

[37] 3/21/2018 Jury Trial Day 5 at 30.

[38] Exh. 42: 12/16/2016 Voluntary Statement of Orlando Thompson at 3; 3/21/2018 Jury Trial Day 5 at 52-53.

[39] 3/21/2018 Jury Trial Day 5 at 40.

[40] 3/21/2018 Jury Trial Day 5 at 40.

(rob someone for eight or nine thousand dollars). [41] Snake shared that "they communicated through pieces of paper" at "Rag Star['s] apartment, at the Pinewood."[42] Thompson further testified Snake shared the following details about the crime,

> Well, he said that Rich [Smith] had jumped out of the car and the guy, he got nervous, something -- the guy made a sudden move and he got nervous and he shot the guy. And he tried to shoot the girlfriend, but she either grabbed the gun or pushed the gun down, and he ran after that.[43]

Thompson, however, didn't immediately report Snake's confession to the police because he allegedly he knew police would want Snake's actual name.[44] So, in the two months between October 15 through December 16, 2015, Thompson testified he started befriending Rag Star, and once he added Rag Star as his friend on Facebook, he learned Snake's name was Travis Sheffield.[45] Only then *after two months* did Thompson contact the police on December 16, 2015.[46] Thompson testified he reported Sheffield because "I was in fear for my life and my daughter's life."[47] Thompson allegedly didn't know he would receive a $2,000 reward.[48]

On December 21, 2015, the State charged Sheffield with inter alia murder with a deadly weapon of Collins, assault with a deadly weapon against Kniesl, and offering or attempting to sell a controlled substance to Kniesl.[49]

---

[41] 3/21/2018 Jury Trial Day 5 at 41-42.

[42] 3/21/2018 Jury Trial Day 5 at 42-43.

[43] 3/21/2018 Jury Trial Day 5 at 42.

[44] 3/21/2018 Jury Trial Day 5 at 31, 44.

[45] 3/21/2018 Jury Trial Day 5 at 44-45.

[46] 3/21/2018 Jury Trial Day 5 at 45.

[47] 3/21/2018 Jury Trial Day 5 at 46.

[48] 3/21/2018 Jury Trial Day 5 at 45.

[49] 12/21/2015 Criminal Complaint.

Days later, on December 31, 2015, Smith pleaded guilty to Attempted Sale of Controlled Substance, Second Offense, with a stipulated sentence of 2-to-10 years; the State dropped the murder and first-degree kidnapping charges.[50] In addition, Smith also pleaded guilty to Conspiracy to Violate the Uniform Controlled Substances Act with a stipulated sentence of 1-to-5 years from a separate case to be served consecutively with his (for a total or 3-to-15 years).[51] Smith also agreed to testify and cooperate in the State's investigation and prosecution of the Collins murder.[52]

### B.    State Trial Court Proceedings

On January 15, 2016, police arrested Sheffield. Mace Yampolsky and Jason Margolis represented Sheffield during his seven-day jury trial, which began on March 15, 2018. Two witnesses testified for the defense. Sheffield's wife Javonique Sheffield provided an alibi: Sheffield could not have perpetrated the shooting because he was with her the entirety of May 11, 2015.[53] Cesar Chavez testified he operated Delta Auto Care, and that according to his records, Thompson only came to the repair shop in July and August of 2015—Thompson didn't come to the repair shop around October 2015 when Sheffield supposedly confessed on the way to the repair shop.[54]

The jury found Sheffield guilty on all counts on March 22, 2018.[55] He waived a penalty hearing by the jury.[56] Sheffield received an aggregate sentence of life imprisonment with eligibility for parole after 362 months.[57]

---

[50] 12/31/2015 Guilty Plea Agreement.

[51] 12/31/2015 Guilty Plea Agreement; 3/20/2018 Jury Trial Day 4 at 82.

[52] 12/31/2015 Guilty Plea Agreement.

[53] 3/21/2018 Jury Trial Day 5 at 94.

[54] 3/21/2018 Jury Trial Day 5 at 88-91.

[55] 3/22/2018 Verdict.

[56] 3/23/2018 Stipulation and Order.

[57] 5/30/2018 Judgment of Conviction.

### C.    State Appellate Court Proceedings

Sheffield timely appealed and was represented by Mace Yampolsky.[58] Sheffield filed an opening brief on October 22, 2018, raising one issue:

1.  Whether there was sufficient evidence to support a conviction of first-degree murder.[59]

Sheffield's counsel waived the opportunity to file a reply brief.[60] The Nevada Supreme Court issued an order of affirmance on July 1, 2019.[61] Remittitur issued on July 26, 2019.[62]

### D.    State Post-Conviction Proceedings

Sheffield filed a pro se petition for writ of habeas corpus with the Eighth Judicial District Court, Clark County, Nevada on May 22, 2020.[63] He also filed a counseled supplemental petition on July 22, 2020.[64] The state district court denied the petition.[65] Sheffield timely appealed.[66]

Sheffield filed an opening brief, raising the following issues:

1.  Whether the district court erred not finding defense counsel rendered ineffective assistance of counsel pre-plea for failing to do necessary pretrial

---

[58] 6/20/2018 Notice of Appeal.

[59] 10/22/2018 Opening Brief.

[60] 1/18/2019 Waiver.

[61] 7/1/2019 Order of Affirmance.

[62] 7/26/2019 Remittitur.

[63] 5/22/2020 Petition for Writ of Habeas Corpus (Postconviction).

[64] 7/22/2020 Supplemental Points and Authorities in Support of Writ of Habeas Corpus for Post Conviction Relief and Request for Evidentiary Hearing

[65] 3/25/2021 Notice of Entry of Findings of Fact, Conclusions of Law and Order.

[66] 4/5/20121 Notice of Appeal.

investigation and preparation and failing to retain necessary experts for consultation during pretrial;

2. The district court erred by not finding counsel was ineffective under Strickland for failing to file a meritorious motion for a pretrial lineup;

3. The district court erred by not finding defense counsel was ineffective during the trial;

4. The district court erred by not finding defense counsel was ineffective on direct appeal; and

5. The accumulation of errors violated Defendant's rights to due process of law under the Fourth, Fifth, Sixth, and Fourteenth Amendments and requires reversal.[67]

The case was transferred to the Nevada Court of Appeals, and that court issued an Order of Affirmance on March 4, 2022.[68] Remittitur issued on March 29, 2022.[69]

### E.    Federal Court Proceedings

Sheffield filed a pro se petition for writ of habeas corpus in federal court on or about April 5, 2022.[70] The Court appointed the Federal Public Defender, District of Nevada, to represent Sheffield on May 20, 2022.[71] Sheffield filed a protective amended petition on August 5, 2022.[72] Sheffield concurrently filed a motion to further

---

[67] 8/17/2021 Opening Brief.

[68] 3/4/2022 Order of Affirmance.

[69] 3/29/2022 Remittitur.

[70] ECF No. 1-1

[71] ECF No. 6.

[72] ECF No. 13.

amend his petition.[73] The Court granted Sheffield's motion.[74] This second amended petition follows.

## Statement Regarding 28 U.S.C. § 2254(d)

For each claim in this petition, Sheffield alleges any rulings from the Nevada appellate courts denying him relief on the merits are (or would be) (1) contrary to, and/or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; and/or (2) are (or would be) based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Sheffield also asserts for the purposes of further review the standard of review in 28 U.S.C. § 2254(d) violates the U.S. Constitution, specifically the Suspension Clause (Article One, Section Nine, clause two); fundamental principles of separation of powers (Articles One, Two, Three); the ban on cruel and unusual punishments (Amendments Eight and Fourteen); and the guarantee of due process (Amendments Five and Fourteen). *But see Crater v. Galaza*, 491 F.3d 1119 (9th Cir. 2007) (rejecting some of these arguments).

## Grounds for Relief

**Ground 1:   The evidence adduced at trial was insufficient to prove Sheffield guilty beyond a reasonable doubt for the death of Jonathan Collins, and thus his judgment of conviction violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution.**

**Statement of Exhaustion:** This claim was exhausted during direct appeal.[75]

Sheffield challenges the sufficiency of the evidence to sustain his conviction. The test of sufficiency of the evidence is whether, reviewing the whole record in the light most favorable to the judgment below, substantial evidence is such that a

---

[73] ECF No. 15.

[74] ECF No. 19.

[75] 10/22/2018 Opening Brief; 7/1/2019 Order of Affirmance.

reasonable finder of fact could find the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307,319 (1979). At trial, the State is required to prove each and "every element of a crime," as well as "every fact necessary to prove the crime" beyond a reasonable doubt. *Apprendi v. New Jersey*, 530 U.S. 466, 476 (2000); *In re Winship*, 397 U.S. 358,364 (1970).

A thorough and careful appraisal of the totality of evidence in the record makes plain that there was insufficient evidence for a reasonable jury to have correctly found enough to convict Sheffield of First-Degree Murder. Preliminarily, the State alleged the shooter killed the decedent for money, but nothing was taken, so evidence with regard to a motive for the killing was inconclusive at best.

The circumstances of the killing also made no sense. Jonathan Collins was shot while in the driver's seat of his vehicle. Sheffield, Kniesl, and Collins were in the vehicle just before the shooting; Rufus Smith had left. Kniesl testified a second, as yet unidentified man approached the vehicle and briefly entered the backseat just before the shooting.[76] The shooter would not plan or commit a killing where a minimum of two eyewitnesses would be able to identify him within the close confines of a vehicle parked in a publicly accessible parking lot.

As explained below, other than three witnesses with serious credibility issues, no physical evidence connected Sheffield to the crime. Accordingly, there was insufficient evidence for a reasonable jury to find him guilty of First-Degree Murder beyond a reasonable doubt.

**No physical evidence connected Sheffield to the crime.**

The identity of the perpetrator was the main issue for the trier of fact. Despite the fact that witness Julie Kniesl alleged that Sheffield shot and killed Jonathan Collins at close range within the closed confines of an automobile, his fingerprints

---

[76] 3/20/2018 Jury Trial Day 4 at 32.

were never discovered at the crime scene.[77] On the other hand, police found fingerprints in the vehicle belonging to co-defendant Rufus Smith, as well as those belonging to the victim and Kniesl.[78] Police also found no DNA belonging to Sheffield inside the vehicle, the parking lot where, or any other tangible piece of evidence collected in the case.[79] The firearm was never recovered and as such could not be tested for the presence of latent fingerprints.

On February 16, 2018, Sheffield filed an Expert Witness Request seeking permission to hire and funds to pay an expert witness to opine on the absence of physical evidence linking Sheffield to the crime scene and what the absence of this evidence may mean. On February 20, 2018, the trial court issued an Order denying Sheffield's Expert Witness Request without a hearing.

**There was a possible alternative perpetrator whom the state of Nevada failed to investigate or identify.**

Julie Kniesl acknowledged the existence of a third person—a young man—who appeared right before the shooting and disappeared just as quickly as he came.[80] No one was able, or willing, to identify this third man. This third person was probably affiliated with co-defendant Rufus Smith because he appeared soon after Smith exited the scene, thereby giving Smith plausible deniability. Police never identified this person, or at least never disclosed the identity to the defense. The lack of evidence for this unidentified black male undermined the credibility of Julie Kniesl, who testified to his existence. In a case where there is a complete lack of physical evidence, no murder weapon, no DNA, no fingerprints, and questionable witnesses, the

---

[77] 3/19/2018 Jury Trial Day 3 at 90-103.

[78] 3/19/2018 Jury Trial Day 3 at 99, 101.

[79] 3/19/2018 Jury Trial Day 3 at 80-89.

[80] 3/20/2018 Jury Trial Day 4 at 32, 51-52, 54.

purported existence of this alternate suspect is yet another piece of the puzzle that the State appears to be missing, raising reasonable doubt of Sheffield's guilt.

**Julie Kniesl only identified Sheffield after he was arrested.**

Despite the horrific nature of the event in which her boyfriend lost his life, Kniesl could not identify the shooter or provide consistent details of what happened that day. Kniesl probably failed to provide details due to her disability, faulty memory, prior criminal record, drug addiction issues, and preexisting relationship with her drug dealer, Rufus Smith. Her inconsistency may have been by design to minimize her own responsibility for setting forth the chain of events that culminated in the death of Collins. Alternatively, Kniesl simply didn't notice much on the day of the crime because she was simply not paying much attention—she testified she was playing on her phone and had just bought crack cocaine.[81]

Julie Kniesl was not certain Sheffield was the person who shot her boyfriend Jonathan Collins from the backseat of the Cadillac. Kniesl didn't identify Sheffield during a photo lineup.[82] She only identified Sheffield at his preliminary hearing, which was highly suggestive because Sheffield had already been charged and was the only person in the courtroom to choose from.[83] Indeed, at the preliminary hearing, Kniesl testified, "I didn't know what he looked like until I arrived today and then I had a face to attach to the name."[84]

This lack of certainty, coupled with the scarcity of physical evidence of any kind placing Sheffield at the scene of the crime, calls into question the sufficiency of the evidence upon which this jury based its verdict. Kniesl was never definitive in her

---

[81] 8/27/2015 Preliminary Hearing at 65, 87-88.

[82] Exh. 19: 5/11/2015 Voluntary Statement by Julie Kniesl at 83; 3/20/2018 Jury Trial Day 4 at 39; 3/21/2018 Jury Trial Day 5 at 73-74.

[83] 3/20/2018 Jury Trial Day 4 at 40.

[84] 9/23/2016 Preliminary Hearing at 66.

identification of Sheffield until she took the stand at the preliminary hearing and saw Sheffield—only then was she suddenly, emphatically assured he was the shooter.

**Rufus Smith only identified Sheffield after he received a generous plea offer.**

Rufus Smith was a critical witness for the State because he was a co-conspirator who turned on Sheffield. Smith had preexisting relationships with all other occupants of the vehicle, whereas Jonathan Collins and Kniesl didn't know Sheffield. Everything that happened that fateful day could not have occurred but for the involvement of Smith.

Smith had every reason to point his finger squarely at Sheffield and sign the favorable plea deal. Although Smith held out for several months after being arrested, he eventually named Sheffield as the shooter after Kniesl testified against him at a preliminary hearing. At trial, Smith testified about his motive for deciding to allegedly conspire with Sheffield to rob Collins:

> Q:   So you couldn't find the weed?
> A:   Said we couldn't find the weed.
> Q:   Uh-huh.
> A:   So we just didn't let it go by.
> Q:   You didn't let it go by?
> A:   Yes.
> Q:   What does that mean?
> A:   We couldn't-we couldn't find the weed at the second location. So we didn't just want to send them and they get it from somewhere else.
> Q:   Okay. So you didn't want them to go buy weed from somewhere else?
> A:   Yes. Yes, sir.
> Q:   So what-what was-I guess what I'm getting at, Rufus, is-did there come a time where you weren't going to get weed for them, you guys were going to do something else?
> A:   Yes. Yes, sir.
> Q:   Okay. And was that your idea or was that the defendant's idea?
> A:   It was the defendant's idea.
> Q:   And what was that idea?

1      A:    To take the money, to rob them.[85]

2   In other words, Smith spent the morning trying to help Collins and Kniesl find a drug

3   dealer, then after two failed stops, Smith suddenly agreed with Sheffield to rob them.

4          Rufus Smith acted as any criminal would do when faced with a lengthy prison

5   sentence—blame someone else and shift the lion's share of the responsibility for the

6   murder at the feet of Sheffield. Smith's motives are certainly suspect. Based on his

7   cross examination, Smith made several key admissions concerning to his credibility:

8      Q:    And as part of that deal (Guilty Plea Agreement), you
9             received a sentence of 3 to 15, correct?
       A:    Yes.
10     Q:    So that means the least time you'll do in prison is
              three years, correct?
11     A:    Correct.
12     Q:    And the most you could do in prison is 15 years,
              correct?
13     A:    Correct.
       Q:    Correct? Okay. So the most you do is nine years-
14     A:    Yes.
       Q:    Yes? Okay. Now you previously testified at the
15            Preliminary Hearing of Sheffield, correct?
16     A:    Correct.
       Q:    And in that, you swore to tell the truth.
17     A:    Yes.
       Q:    Correct? And you did tell the truth?
18     A:    I did.
       Q:    Okay. And do you remember being asked if you came
19            in here today and said Sheffield-excuse me-and said,
20            Sheffield, he had nothing to do with this, your
              sentence next week wouldn't be the two year
21            minimum, would it? And you said, "probably wouldn't
              get a deal." Do you remember that?
22     A:    Yes.
23     Q:    Okay. And you were also asked: "Are you testifying
              today, pointing Sheffield out, in large part just to take
24            advantage of this good deal you got in District Court?"
25            And you said, "Yes, sir."
       A:    Yes.
26

27
_____

[85] 3/20/2018 Jury Trial Day 4 at 74-75.

14

Q:    Okay. And you said you didn't see the shooting?
A:    Correct.
Q:    Correct? You heard the gunshot?
A:    Correct.
Q:    After you got out of the car, did you see anyone else
       get into the car?
A:    No.
Q:    And on-on that day, you didn't know who pulled the
       trigger?
A:    No, I didn't.
Q:    You're friends with Orlando Thompson?
A:    Yes.[86]

To recap, Smith admitted he probably wouldn't have blamed Sheffield but for the plea deal. Smith was objectively biased because he avoided a murder charge and received just 3-to-15 years (3-to-9 years with good behavior) in exchange for his testimony against Sheffield. Smith also admitted he was friends with Orlando Thompson, a witness who just so happens to receive murder confessions from people he hardly knows while on the way to pick up his car. In the absence of any physical evidence linking Sheffield to the crime, Smith's obvious credibility issue undermined confidence in Sheffield's conviction.

**Orlando Thompson's story strains credibility.**

Thompson provided the most incredulous testimony against Sheffield: Sheffield allegedly confessed to murder while Thompson, a known friend of Rufus Smith, sat in the backseat. At trial, Thompson took great pains to try and put some distance between himself and Smith, attempting to downplay their friendship during cross examination:

Q:    Mr. Thompson, you were friends with Rufus.
A:    No.
Q:    You were acquaintances with Rufus?
A:    Yes.
Q:    Business associates, shall we say?
A:    Yes.

---

[86] 3/20/2018 Jury Trial Day 4 at 90-91.

Q:    Because he supplied you with weed?
A:    Yes.
Q:    And after, you also sold weed?
A:    Yes.
Q:    And many people knew you sold weed?
A:    Yes.
Q:    And after Rufus called you from jail, Sheffield and, I'll
      call her Red, came to visit you, correct?
A:    Yes.[87]

The above exchange is emblematic of Thompson's role throughout the case wherein he minimized his own associations with both Sheffield and Smith, yet he seems to know intimate details regarding the incidents leading to crime. If Thompson is to be believed, he knew Smith only casually through prior marijuana transactions, and he barely knew Sheffield. Furthermore, just prior to confessing, Sheffield allegedly asked Thompson about his three-way calls with Smith.[88] Under those circumstances, it strains credulity to believe that Sheffield would, unsolicited and without prompting, volunteer his involvement in a robbery and homicide with a friend of Smith's. And as icing on the cake, the State paid $2,000 for Thompson's testimony.[89]

Moreover, Thompson's testimony couldn't be verified and was actually contradicted by defense witness Cesar Chavez. Thompson alleged Snake's uncle was giving him a ride to put up his car to Delta Auto Body.[90] Cesar Chavez, the owner of Delta Auto, testified he has no receipts for Thompson during the relevant time period.[91] Thompson went on to explain that he would sometimes hire pay Sheffield's

---

[87] 3/21/2018 Jury Trial Day 5 at 51-52.

[88] 3/21/2018 Jury Trial Day 5 at 40.

[89] 3/21/2018 Jury Trial Day 5 at 45.

[90] 3/21/2018 Jury Trial Day 5 at 52-53.

[91] 3/21/2018 Jury Trial Day 5 at 87-91.

uncle, whom he knew only as "Unc," for rides around town.[92] During one of these
rides, Sheffield was also in the car:

> Q:   Okay. Now you previously-you previously testified
>       that when you were in the car with Mr. Travis-excuse
>       me, Sheffield and Unc, that Sheffield told Unc that he
>       shot someone?
> A:   Yes.
> Q:   All right. And was-and this was after he-he told you
>       they were trying to hit a lick, correct?
> A:   Well-
> Q:   Try and do a lick?
> A:   What?
> Q:   Do you understand what I'm saying?
> A:   No, I don't.
> Q:   Okay. You testified previously that when Sheffield
>       talked to you, he said they were going to do a lick,
>       correct?
> A:   Yeah. Well, he wasn't speaking directly to me. He was-
> Q:   Oh, who was he speaking to?
> A:   He was speaking to Unc.
> Q:   He was speaking to Unc. And he said, we were-we
>       were going to do a -it is-let me back, the term is hit a
>       lick?
> A:   Yes.
> Q:   Correct? Okay. And he asked you something about
>       eight racks?
> A:   Yeah. Eight or nine racks.
> Q:   And that would be $8- or $9,000.00?
> A:   Yes.
> Q:   Okay. And he was saying this to you, or is he saying
>       this to Unc?
> A:   No. He was speaking to Unc.
> Q:   Okay. Now, he said he got nervous and shot this guy,
>       correct?
> A:   Yes.
> Q:   And he said that to you?
> A:   No.[93]

---

[92] 3/21/2018 Jury Trial Day 5 at 26.

[93] 3/21/2018 Jury Trial Day 5 at 54-55.

Notably, police never bothered to interview Unc, who was the driver of the vehicle when Sheffield allegedly confessed.

During closing arguments, the State argued Thompson was credible because he offered a detail to the crime: that there was "eight or nine racks ($8,000 or $9,000)" in the vehicle.[94] The State claimed Thompson must have learned this information from Sheffield. On the contrary, Thompson could have learned this information from Smith. After all, Thompson and Smith were friends.[95] Thompson admitted communicating with Smith while Smith was in jail because Thompson testified helping Smith facilitate three-way calls.[96] By the time Thompson provided his voluntary statement to the police, Kniesl had testified against Smith at his preliminary hearing, so Smith could have also relayed details from Kniesl's testimony. Thus, Thompson's knowledge of the details was irrelevant and added nothing to his credibility. If anything, Thompson's knowledge of details may suggest he worked with Smith to accuse Sheffield.

The dubious nature of Thompson's testimony, when viewed alongside the similarly afflicted testimony of Julie Kniesl and co-defendant Rufus Smith and, should have raised reasonable doubt as to Sheffield's ultimate guilt. On the other hand, the defense presented Cesar Chavez, who testified Thompson didn't come to his shop that day,[97] and an alibi witness, Javonique Sheffield, who testified Sheffield was with her at home that entire day.[98] Accordingly, the Nevada Supreme Court's decision denying Sheffield relief was contrary to, or involved an unreasonable application, of clearly established federal law, and/or involved an unreasonable

---

[94] 3/22/2018 Jury Trial Day 5 at 19, 59.

[95] 3/20/2018 Jury Trial Day 4 at 91.

[96] 3/21/2018 Jury Trial Day 5 at 40.

[97] 3/21/2018 Jury Trial Day 5 at 87-91.

[98] 3/21/2018 Jury Trial Day 5 at 95-96.

determination of the facts adduced in the state court record under 28 U.S.C. § 2254(d)(1) and (d)(2).

**Ground 2:    Sheffield was denied effective assistance of trial counsel under the Sixth and Fourteenth Amendments to the United States Constitution for the following reasons:**

### A.    Failure to test fingerprints of pill bottle filled with bullets.

**Statement of Exhaustion:** This claim is new, technically exhausted, and procedurally defaulted, but Sheffield overcomes the default under *Martinez v. Ryan.*

Police recovered a pill bottle container at the first apartment with .32 caliber cartridges.[99] The State's firearms analyst testified the shooter used .32 caliber ammunition in this case.[100] Police, however, failed to take fingerprints from the pill bottle.[101] Kniesl testified the shooter smoked weed with her, Collins, and Smith at the first apartment.[102] It's reasonable to believe the ammunition in the pill bottle was used by the shooter. Had trial counsel filed a motion to fingerprint the pill bottle, trial counsel could have persuaded whoever handled the pill bottle was the actual shooter. After all, during deliberations, the jury sent a note asking about fingerprints on the pill bottle.[103] The note demonstrated the jury had doubts about the identity of the shooter and thought the ownership of the pill bottle and .32 caliber cartridges was important. Thus, trial counsel was ineffective for failing to test it.

### B.    Failed to address four jury questions.

**Statement of Exhaustion:** This claim is new, technically exhausted, and procedurally defaulted, but Sheffield overcomes the default under *Martinez v. Ryan.*

---

[99] Exh. 25: 5/11/2015 LVMPD Officer's Report at 18.

[100] 3/19/2018 Jury Trial Day 3 at 73.

[101] See 3/19/2018 Jury Trial Day 3 at 98-103 (no mention of pill bottle).

[102] 3/20/2018 Jury Trial Day 4 at 14.

[103] 3/22/2018 Jury Trial Day 6 at 68.

During deliberations, the jury sent a note to the court with four questions they wanted answered before the made their decision:

> Number one, who lived in the apartment (3601 Cambridge, #229) (first apartment)?
> Number two, is defendant right or left-handed?
> Number three, where was Julie [Kniesl]'s purse at the time of the shooting?
> Number four, were fingerprints taken of the pill bottle with the bullets in it found at first apartment? If so, who? Exhibit 83.[104]

Trial counsel conceded he couldn't supplement the record with new evidence at that point.[105]

By asking these evidentiary questions, the jurors expressed doubt on Sheffield's guilt. Trial counsel was deficient for failing to address the juror's questions during trial. Had trial counsel answered the questions during trial, there is a reasonable probability of a different outcome.

Police recovered a pill bottle container at the Cambridge apartment (the first apartment) with .32 caliber cartridges.[106] The State's firearms analyst testified the shooter used .32 caliber ammunition in this case.[107] Police, however, failed to take fingerprints from the pill bottle.[108] Kniesl testified the shooter smoked weed with her, Collins, and Smith at the first apartment.[109] It's reasonable to believe the ammunition in the pill bottle was used by the shooter. Had trial counsel filed a motion

---

[104] 3/22/2018 Jury Trial Day 6 at 68.

[105] 3/22/2018 Jury Trial Day 6 at 68.

[106] Exh. 25: 5/11/2015 LVMPD Officer's Report at 18.

[107] 3/19/2018 Jury Trial Day 3 at 73.

[108] *See* 3/19/2018 Jury Trial Day 3 at 98-103 (no mention of pill bottle).

[109] 3/20/2018 Jury Trial Day 4 at 14.

to fingerprint the pill bottle, trial counsel could have persuaded whoever handled the pill bottle was the actual shooter.

The pill bottle was important because the jury asked who rented the apartment where it was found. Trial counsel could have obtained this information during the examination of Rufus Smith or the police. After all, Smith led Collins and Kniesl to the first apartment.[110] Rufus testified Sheffield and another person were inside the apartment.[111] The evidence presented at trial was unclear whether Sheffield or the other person resided there. Smith presumably knew who lived there. And according to the police report, Arthur "Rag Star" Cooper was the renter, not Sheffield.[112] It's reasonable the jury wanted to know who lived at the first apartment because the police found the pill bottle with the .32 caliber cartridges there. Had the jury known to whom the pill bottle belonged, trial counsel could have raised reasonable doubt whether Sheffield was the shooter.

The jury also wanted to know more details about how the shooting took place inside the car. By asking whether Sheffield was right- or left-handed and where Kniesl had her purse, the jury demonstrated they struggled with the body mechanics of the shooting. Trial counsel could have asked Sheffield's wife, Javonique, whether he was right- or left-handed. Trial counsel also could have asked Kniesl where she placed her purse with $800.[113] The jury probably had questions about the crime itself because the motive didn't make sense. Smith testified there was a conspiracy to rob Collins and Kniesl,[114] but the shooter never attempted to take money from Kniesl. In fact, according to Kniesl, just before the shooting occurred, another man entered the

---

[110] 3/20/2018 Jury Trial Day 4 at 68.

[111] 3/20/2018 Jury Trial Day 4 at 68.

[112] Exh. 25: 5/11/2015 LVMPD Officer's Report at 14.

[113] 3/20/2018 Jury Trial Day 4 at 27.

[114] 3/20/2018 Jury Trial Day 4 at 75-76.

backseat of the car.[115] Then after the shooting occurred, the two men in the backseat ran off in separate directions.[116] Neither demanded money nor searched for money in the car, despite $8,000 in the trunk and another $800 in the purse.[117] They just bolted away. Answering these two jury inquiries may undermined Kniesl's credibility on how the shooting occurred. Therefore, trial counsel was ineffective for failing to address the jury's four inquires, which meant Sheffield lost four opportunities to raise reasonable doubt.

### C.    Failure to mention alibi witness JaVonique Sheffield during closing arguments.

**Statement of Exhaustion:** This claim was exhausted during post-conviction.[118]

For his defense, trial counsel presented Javonique Sheffield who testified on the day of the shooting, May 11, 2015, Sheffield was home with her all day.[119] During closing arguments, however, trial counsel failed to mention this alibi defense. In rebuttal closing arguments, the State pounced on trial counsel's failure to mention the alibi defense, arguing the trial counsel's neglect meant that Javonique lacked credibility.[120]

Trial counsel's deficient performance prejudiced Sheffield. "[T]he very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free." *Herring v. New York*, 422 U.S. 853, 862 (1975). Closing arguments

---

[115] 3/20/2018 Jury Trial Day 4 at 28-29.

[116] 3/20/2018 Jury Trial Day 4 at 32.

[117] 3/20/2018 Jury Trial Day 4 at 27.

[118] 3/4/2022 Order of Affirmance.

[119] 3/21/2018 Jury Trial Day 5 at 96.

[120] 3/22/2018 Jury Trial Day 6 at 62-63.

play a critical role at trial—"no aspect of such advocacy could be more important than the opportunity finally to marshal the evidence for each side before submission of the case to judgment." *Id.* It's only in closing a defendant can present a complete defense—"it is only after all the evidence is in that counsel for the parties are in a position to present their respective versions of the case as a whole" and that "for the defense, closing argument is the last clear chance to persuade the trier of fact that there may be reasonable doubt of the defendant's guilt." *Id.*

Trial counsel needed Javonique's alibi testimony because three witnesses pointed the finger at Sheffield, but each of the State's three witnesses had credibility issues, as argued in Ground 1 and incorporated herein. Julie Kniesl couldn't identify the shooter from a lineup and merely presumed Sheffield was the shooter when she saw him at the preliminary hearing: "I didn't know what he looked like until I arrived today and then I had a face to attach to the name."[121] Rufus Smith admitted he only identified Sheffield as the shooter because he got a plea deal: "'Are you testifying today, pointing Sheffield out, in large part just to take advantage of this good deal you got in District Court?' . . . Yes."[122] And Orlando Thompson, the State's $2,000 witness,[123] dubiously claimed Sheffield confessed to the crime while Thompson was in the backseat of the car, despite Sheffield knowing Thompson helped facilitate three-way calls for Smith in jail.[124] Javonique's testimony only further undermined the State's case against Sheffield. Accordingly, trial counsel was ineffective for failing to argue an alibi defense supported by witness testimony.

---

[121] 9/23/2016 Preliminary Hearing at 66.

[122] 3/20/2018 Jury Trial Day 4 at 90-91.

[123] 3/21/2018 Jury Trial Day 5 at 45.

[124] 3/21/2018 Jury Trial Day 5 at 40.

**D.      Failure to obtain an expert on eyewitness identification.**

**Statement of Exhaustion:** This claim was exhausted during post-conviction.[125]

Despite the horrific nature of the event in which her boyfriend lost his life, Julie Kniesl could not identify the assailant or provide consistent details of what happened that day. Kniesl was not certain Sheffield shot her boyfriend Jonathan Collins from the backseat. Kniesl could not adequately identify Sheffield during a photo lineup.[126] She only identified Sheffield at his preliminary hearing, which was highly suggestive because Sheffield had already been charged and was the only person to choose from.[127] At the preliminary hearing, Kniesl testified, "I didn't know what he looked like until I arrived today and then I had a face to attach to the name."[128]

Trial counsel should have hired an expert on eyewitness identification to explain to the jury why Kniesl's identification of Sheffield was unreliable. Sheffield sought an eyewitness identification expert during post-conviction,[129] but the state court denied his petition without an evidentiary hearing. Upon appointment of federal counsel, Sheffield hired Dr. Cara Laney, a psychology professor and an expert on eyewitness identifications, police procedures, and jury decision-making.[130] Dr. Laney heavily criticized police photo lineups because the pictures in the lineups didn't

---

[125] 3/4/2022 Order of Affirmance.

[126] Exh. 19: 5/11/2015 Voluntary Statement by Julie Kniesl at 83; 3/20/2018 Jury Trial Day 4 at 39; 3/21/2018 Jury Trial Day 5 at 73-74.

[127] 3/20/2018 Jury Trial Day 4 at 40.

[128] 9/23/2016 Preliminary Hearing at 66.

[129] 7/22/2020 Supplemental Points and Authorities in Support of Writ of Habeas Corpus for Post Conviction Relief and Request for Evidentiary Hearing at 30.

[130] Exh. 49: Expert Report by Cara Laney at 1.

match the Kniesl's description of shooter.[131] Other factors may have also affected Kniesl's identification and memory. Kniesl is white and the shooter is black, so her identification may have been affected by cross-race bias.[132] Kniesl's memory may have been compromised because she focused on the weapon pointed at her rather than focusing on the face of the shooter.[133]

Most importantly, Dr. Laney described Kniesl's in-court identification as "essentially worthless and should not be relied upon."[134] This is because inter alia Kniesl made the identification 16 months after the crime and saw at least 24 faces in police lineups during the interim.[135] And prior to making her in-court identification, the police informed her that they had arrested the culprit, making her identification "the product of outside information and her own assumptions rather than her memory for the crime."[136] Kniesl may have experienced "unconscious transference, essentially confusing her memory for the perpetrator with her memory for another person, encountered elsewhere"—i.e., "where a face is remembered as being from one context (e.g., the man holding the gun) when in fact he was seen in another context (e.g., on the street, in a mugshot, or in a different role in the crime).[137] According to Dr. Laney, this problem cannot be corrected—Kniesl's corrupted memory cannot be undone and she has permanently associated her memory of the shooter with the person she saw at the preliminary hearing, Sheffield.[138]

---

[131] Exh. 49: Expert Report by Cara Laney at 8.

[132] Exh. 49: Expert Report by Cara Laney at 8-9.

[133] Exh. 49: Expert Report by Cara Laney at 14.

[134] Exh. 49: Expert Report by Cara Laney at 10.

[135] Exh. 49: Expert Report by Cara Laney at 11.

[136] Exh. 49: Expert Report by Cara Laney at 12.

[137] Exh. 49: Expert Report by Cara Laney at 13-14.

[138] Exh. 49: Expert Report by Cara Laney at 15.

Dr. Laney would have testified Kniesl's identification of Sheffield was "unduly influential" to the jury.[139] According to Dr. Laney, "Jurors put substantial faith in eyewitness identifications and often overvalue witness confidence." At the same time, "Jurors also undervalue key factors, including identification procedure errors."[140] Taken together, Kniesl's identification of Sheffield was unreliable, and the jury heavily relied on this unreliable identification. Had trial counsel was hired an expert in eyewitness identification like Dr. Laney, trial counsel could have undermined Kniesl's credibility.

Accordingly, the Nevada Supreme Court's decision denying Sheffield relief was contrary to, or involved an unreasonable application, of clearly established federal law, and/or involved an unreasonable determination of the facts adduced in the state court record under 28 U.S.C. § 2254(d)(1) and (d)(2).

### E.    Failure to file a meritorious motion for a pretrial lineup.

**Statement of Exhaustion:** This claim was exhausted during post-conviction.[141]

As argued in Grounds 1 and 2(D) and incorporated herein, the State used a suggestive in-court identification procedure for Julie Kniesl to identify Sheffield. Trial counsel knew his client would likely be identified during a suggestive in-court show-up at the preliminary hearing. Trial counsel, however, did nothing to challenge the unconstitutional identifications. Trial counsel should have filed a motion for a pretrial lineup to address this problem.

Nearly fifty years ago, the United States Supreme Court in a trilogy of cases, *United States v. Wade*, 388 U.S. 218 (1967); *Gilbert v. California*, 388 U.S. 263 (1967);

---

[139] Exh. 49: Expert Report by Cara Laney at 16.

[140] Exh. 49: Expert Report by Cara Laney at 16.

[141] 3/4/2022 Order of Affirmance.

*Stovall v. Denno*, 388 U.S. 293 (1967) found that the right to counsel applies to physical lineups. The Supreme Court noted, "The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification. *Wade*, 388 U.S. at 228 (citations omitted). Human error hasn't changed since then, and the State keeps applying flawed identification procedures.

Trial counsel's failure to move for a pretrial lineup prejudiced Sheffield. In preparation for the preliminary hearing, police informed Julie Kniesl that they had arrested the shooter. Kniesl predictable identified Sheffield at the preliminary hearing despite failing to identify him in previous photo lineups. A pretrial lineup could have protected Sheffield from the suggestive in-court identification. Accordingly, the Nevada Supreme Court's decision denying Sheffield relief was contrary to, or involved an unreasonable application, of clearly established federal law, and/or involved an unreasonable determination of the facts adduced in the state court record under 28 U.S.C. § 2254(d)(1) and (d)(2).

## F. Failure to object to prosecutorial misconduct during closing argument.

**Statement of Exhaustion:** This claim was exhausted during post-conviction.[142]

The prosecutor engaged in misconduct during closing argument. Consider the following excerpts from the record. First:

> How about Rufus? Now, Rufus, as we've talked about -- you know, we're not trying to hide this. He was involved. He pled guilty to two felonies. He's doing up to 15 years in prison and he has to testify truthfully. He knew the

---

[142] 3/4/2022 Order of Affirmance.

> defendant for a while. He's not going to be confused about
> who he is or who was in the car.[143]

By arguing Rufus wouldn't be confused, the prosecutor improperly vouched for Rufus's credibility.

Then on rebuttal, speaking of the State's witness Julie Kniesl:

> Consider this: Consider Julie's motive for picking the
> wrong person. She even told you the first time she saw the
> lineup, she didn't circle anyone. She's not going to guess.
> She's not going to get it wrong. Her boyfriend is the one
> who died. Don't you think she has more incentive than
> anybody else to make sure that that person is correctly
> identified? Otherwise, he's still out there running
> around.[144]

The prosecutor committed misconduct by vouching for the accuracy and reliable for Kniesl's identification.

Also on rebuttal, speaking of Rufus Smith:

> And look, he was originally charged with the murder.
> That's not a secret that we've been keeping from you. But
> when you look at the instructions and you listen to what he
> said, he didn't intend for anyone to get murdered. He didn't
> apparently know that he even had gun.[145]

The prosecutor apparently tried to suggest to the jury there was some legal instruction or some obvious facts exculpating Rufus Smith in this case. This was prosecutorial misconduct stating facts not in evidence and misstating the law.

The prosecutor continued:

> All he was asked to do, ladies and gentlemen, is tell the
> truth in regards to testifying, whatever that may be. And
> you got to see him. He was in here, in his prison clothes and
> chains, testifying for you. Did he look like this was -- he had
> just, you know -- this was the last part of that great deal he

---

[143] 3/22/2018 Jury Trial Day 6 at 23.

[144] 3/22/2018 Jury Trial Day 6 at 51-52.

[145] 3/22/2018 Jury Trial Day 6 at 56.

> got. Did he seem excited and happy to be here? Did he seem
> like he was just itching to give me answers? Or was it like
> pulling teeth to get him to tell me what happened? He
> answered the questions. And you certainly saw how he
> answered them.[146]

Here, the prosecutor vouched for Smith's credibility based on his personal opinion that Smith was a reluctant witness.

Despite such clear and obvious misconduct, trial counsel never objected, sought a curative instruction, or moved for a mistrial. The totality of the vouching and misconduct was part of the State's carefully calculated attempt to insert the prosecutor's personal opinion of the evidence to the detriment of Sheffield. In combination, these statements were extremely persuasive to the jury because a prosecutor's personal opinion carries great weight. Trial counsel was ineffective for failing to object. Accordingly, the Nevada Supreme Court's decision denying Sheffield relief was contrary to, or involved an unreasonable application, of clearly established federal law, and/or involved an unreasonable determination of the facts adduced in the state court record under 28 U.S.C. § 2254(d)(1) and (d)(2).

**G.     Failure to object to the testimony of Dr. Jennifer Corneal.**

**Statement of Exhaustion:** This claim is new, technically exhausted, and procedurally defaulted, but Sheffield overcomes the default under *Martinez v. Ryan*.

The Constitution guarantees a defendant the right to confront witnesses. Where hearsay is involved, the Supreme Court has said that "where 'testimonial' hearsay evidence is at issue, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36 (2004). Trial counsel failed to object when the State violated Sheffield's constitutional right to confrontation.

---

[146] 3/22/2018 Jury Trial Day 6 at 57.

At trial, the State called Jennifer Corneal to testify as a medical examiner for the Clark County Coroner's Office.[147] Dr. Corneal testified about an autopsy that had been performed on Jonathan Collins as well as a toxicology report that had been prepared.[148] However, Dr. Corneal didn't performed the autopsy herself, nor did she prepare the toxicology report; instead, Dr. Elaine Olson (who had retired by the time of Sheffield's trial) performed the autopsy and prepared the toxicology report.[149] There was no evidence to suggest Dr. Olson was unavailable.

Under *Melendez-Diaz v. Massachusetts,* 557 U.S. 305 (2008), assertions in drug lab reports made for the primary purpose of producing evidence for litigation are testimonial when they are formalized or accuse a targeted individual of a crime. *See also Williams v. Illinois,* 567 U.S. 50, 84 (2012) ("Introduction of the reports in those cases ran afoul of the Confrontation Clause because they were the equivalent of affidavits made for the purpose of proving the guilt of a particular criminal defendant at trial.") Here, Dr. Corneal relayed the findings and conclusions from the toxicology report in violation of *Melendez-Diaz.* On top of that, Dr. Corneal recounted the findings and conclusions of the autopsy report created by someone else. The same principles that apply to forensic reports apply to autopsies. Dr. Corneal's testimony violated Sheffield's confrontation rights.

Trial counsel's failure to object prejudiced Sheffield. Dr. Corneal testified the cause and the manner of Collins's death: "Gunshot wound to the chest, homicide."[150] Without the testimony, the State lacked the foundation for its murder case against Sheffield. Accordingly, trial counsel was ineffective.

---

[147] 3/21/2018 Jury Trial Day 5 at 6.

[148] 3/21/2018 Jury Trial Day 5 at 8-13.

[149] 3/21/2018 Jury Trial Day 5 at 7, 11.

[150] 3/21/2018 Jury Trial Day 5 at 8.

### H.    The cumulative effect of counsel's errors prejudiced Sheffield.

**Statement of Exhaustion:** This claim was exhausted during post-conviction.[151]

The numerous errors and deficiencies of counsel in this case require reversal of the conviction. Trial counsel never sought to test the pill bottle with the same caliber of ammunition inside as those used in the shooting. The jury clearly thought the pill bottle was important because during deliberations, they asked whose fingerprints were on the bottle and whose apartment was it found in. Trial counsel also failed to argue Sheffield alibi defense during closing arguments. This was important because the three eyewitnesses each lacked credibility, none more than Julie Kniesl, who failed to identity Sheffield from a photo lineup and only identified Sheffield after the police arrested him. An expert on eyewitness identification would have further undermined Kniesl's identification as "essentially worthless." Alternatively, trial counsel could have requested a pretrial lineup prior to the preliminary hearing so that the State couldn't induce such a suggestive identification from Kniesl. And finally, trial counsel failed to object when the State bolstered the credibility of Kniesl and Smith during closing arguments.

Taken together, trial counsel's failures prejudiced Sheffield. Had trial counsel performed effectively, there is a reasonable probability that the jury would have concluded there was reasonable doubt whether Sheffield was actually the shooter and acquitted him.

**Ground 3:    Sheffield was denied his right to confrontation under the Sixth and Fourteenth Amendments to the United States Constitution.**

**Statement of Exhaustion:** This claim is new, technically exhausted, and procedurally defaulted, but Sheffield overcomes the default under *Martinez v. Ryan*.

---

[151] 3/4/2022 Order of Affirmance.

The Constitution guarantees a defendant the right to confront witnesses. Where hearsay is involved, the Supreme Court has said that "where 'testimonial' hearsay evidence is at issue, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36 (2004). Applying *Crawford*, Sheffield can demonstrate that he was denied his constitutional right to confrontation.

At trial, the State called Jennifer Corneal to testify as a medical examiner for the Clark County Coroner's Office.[152] Dr. Corneal testified about an autopsy that had been performed on Jonathan Collins as well as a toxicology report that had been prepared.[153] However, Dr. Corneal didn't performed the autopsy herself, nor did she prepare the toxicology report; instead, Dr. Elaine Olson (who had retired by the time of Sheffield's trial) had performed the autopsy and prepared the toxicology report.[154] There was no evidence to suggest Dr. Olson was unavailable.

Under *Melendez-Diaz v. Massachusetts,* 557 U.S. 305 (2008), assertions in drug lab reports made for the primary purpose of producing evidence for litigation are testimonial when they are formalized or accuse a targeted individual of a crime. *See also Williams v. Illinois,* 567 U.S. 50, 84 (2012) ("Introduction of the reports in those cases ran afoul of the Confrontation Clause because they were the equivalent of affidavits made for the purpose of proving the guilt of a particular criminal defendant at trial.") Here, Dr. Corneal relayed the findings and conclusions from the toxicology report in violation of *Melendez-Diaz*. On top of that, Dr. Corneal recounted the findings and conclusions of the autopsy report created by someone else. The same

---

[152] 3/21/2018 Jury Trial Day 5 at 6.

[153] 3/21/2018 Jury Trial Day 5 at 8-13.

[154] 3/21/2018 Jury Trial Day 5 at 7, 11.

principles that apply to forensic reports apply to autopsies. Dr. Corneal's testimony violated Sheffield's confrontation rights.

**PRAYER FOR RELIEF**

Accordingly, Sheffield respectfully requests that this Court:

1.     Issue a writ of habeas corpus to have Sheffield brought before the Court so that he may be discharged from his unconstitutional confinement;

2.     Conduct an evidentiary hearing at which proof may be offered concerning the allegations in this amended petition any defenses that may be raised by respondents; and

3.     Grant such other and further relief as, in the interests of justice, may be appropriate.

Dated December 6, 2023.

Respectfully submitted,

Rene L. Valladares
Federal Public Defender

*/s/ Ron Sung*

Ron Sung
Assistant Federal Public Defender

### DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury under the laws of the United States of America and the State of Nevada that the facts alleged in this petition are true and correct to the best of counsel's knowledge, information, and belief.

Dated December 6, 2023.

Respectfully submitted,

Rene L. Valladares
Federal Public Defender

*/s/ Ron Sung*

Ron Sung
Assistant Federal Public Defender

34