UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| TRAVIS SHEFFIELD,<br><br>    Petitioner,<br><br>    v.<br><br>STATE OF NEVADA, *et al.*,<br><br>    Respondents. | Case No. 2:22-cv-00584-GMN-NJK<br><br>**ORDER** |

## I.    Summary

This action is a petition for writ of habeas corpus by Travis Sheffield, an individual incarcerated at Nevada's High Desert State Prison, in Indian Springs, Nevada.  Sheffield is represented by appointed counsel.  The case is before the Court on a motion by Sheffield for leave to conduct discovery and for resolution on its merits. The Court denies Sheffield's discovery motion and denies his habeas petition.

## II.    Background

On May 30, 2018, following a jury trial, Sheffield was convicted in Nevada's Eighth Judicial District Court (Clark County) of first-degree murder with use of a deadly weapon, assault with a deadly weapon, and offer or attempt to sell controlled substance. ECF No. 46-29 (jury verdict); ECF No. 46-37 (judgment of conviction).  On Count 1, first-degree murder, he was sentenced to twenty years to life in prison plus a consecutive term of eight to twenty years for the deadly weapon enhancement; on Count 2, assault with a deadly weapon, he was sentenced to 28 months to six years, consecutive to the sentence on Count 1; and on Count 3, offer or attempt to sell controlled substance, he was sentenced to 28 months to six years, consecutive to the sentence on Count 2—an aggregate sentence of 32 years and eight months to life in prison. ECF No. 46-37.

In May of 2015, Julie Kneisl and her boyfriend Jonathan (or Jon) Collins, both hearing impaired, drove from Minnesota to Colorado in their black Cadillac. ECF No. 46-24 at 8–10, 42, 71.  While in Colorado, Kneisl and Collins contacted Rufus (or Rich) Smith, who was in Las Vegas, and inquired about purchasing marijuana. *Id*. at 9–11. Collins asked Smith for five to ten pounds of marijuana. *Id*. at 11, 28.  The price they discussed ranged from $1300 to $2200. *Id*. at 11.  With $8,000 in the trunk and $800 in Kneisl's purse, Kneisl and Collins drove from Colorado to Las Vegas. *Id*. at 10, 12, 28.

When Kneisl and Collins arrived in Las Vegas, they met up with Smith, who was with his girlfriend, at a 7-Eleven store. *Id*. at 12, 68.  Kneisl and Collins then followed Smith and his girlfriend to an apartment complex on Cambridge Street. *Id*. at 13, 69. Inside an apartment there, Smith introduced Kneisl and Collins to Sheffield, who was supposed to sell them marijuana. *Id*. at 13.  Sheffield did not live at the apartment. *Id.* at 70.  Smith's girlfriend entered the apartment but left shortly thereafter in Smith's vehicle. *Id*. at 69, 80.  Another unnamed individual was present when the group arrived, but he left shortly thereafter as well. *Id*. at 13–14, 69–70.

Collins and Kneisl were at the apartment for approximately an hour and a half. *Id*. at 14.  While there, Collins, Smith and Sheffield discussed the marijuana. *Id*. at 14, 70. Sheffield showed Collins the marijuana, and Collins, Smith and Sheffield smoked some. *Id*. at 15, 70.  Collins did not buy any of that marijuana, however, because there was only a small amount and/or because it was of poor quality. *Id*. at 15, 70–71.  Smith asked Collins if he could borrow between $500 and $1000 for rent. *Id*. at 16.  Kneisl replied "no." *Id*.  Collins and Kneisl were then ready to leave. *Id*.  Smith and Sheffield conversed with one another, facing away from Kneisl and Collins. *Id*.  Smith turned around and asked if he could join Collins and Kneisl in their vehicle. *Id*.

Collins asked Kneisl if they should ask Smith about buying some crack cocaine, and Kneisl replied "no." *Id*.  But Collins felt obligated to purchase something because of Smith's and Sheffield's body language; Kneisl testified that she and Collins "could tell that they were getting kind of upset about the whole situation." *Id*. at 16–17.

Collins, Kneisl and Smith then left the apartment and rode together to another nearby apartment complex, which Smith called "Las Palmas," looking for marijuana or crack. *Id*. at 17, 71–72.  Sheffield did not join them on the drive there. *Id*. at 18.  While parked there, Collins gave Smith $100 to buy some crack. *Id*. at 17-18, 73.  Smith left the car and entered the apartment to buy the crack; Kneisl and Collins waited in the car for about 45 minutes. *Id*. at 17–19, 73–74.  Before Smith returned, Kneisl suggested that they leave, but Collins said "no, I can't lose him as a friend." *Id*. at 19.  Kneisl said "okay, that's fine," and they waited. *Id*.

When Smith returned with the crack, he entered the vehicle, and the group proceeded to back out of their parking spot. *Id*. at 19.  While they were backing up, Sheffield appeared—surprising and confusing Kneisl—and entered the car. *Id*. at 19–21.  Then, with Collins driving, Kneisl in the front passenger seat, Smith in the passenger seat behind Kneisl, and Sheffield in the passenger seat behind Collins, the group drove to a third nearby location, at Royal Crest Circle, with Sheffield giving driving directions. *Id*. at 20–21, 77–78.  Collins and Kneisl thought maybe they were going to buy marijuana. *Id*. at 21.  But Smith testified regarding his and Sheffield's intentions:

> Q.    [by the prosecutor]  Okay.  Did he [Sheffield] tell you why he was going to come meet up with you [at Las Palmas]?
>
> A.    [Smith]  He—he came to the Las Palmas and met up with me so we could get in the car together.
>
> Q.    Okay.  But, Rufus, let me ask—let me ask it again.  Before you met up with him, did you know why he was coming to meet up with you?
>
> A.    Yes.  So we could try to get some weed.
>
> Q.    Okay.  So when he was coming to meet you, you thought you were still just trying to find weed for Jon and Julie?
>
> A.    Yes.
>
> Q.    At some point did that change?
>
> A.    Yes, it changed.
>
> Q.    Okay. And what did it change to?  Like, what was the new plan?
>
> A.    We couldn't get no weed.

Q. Okay.

A. So we ain't want to let it go by.

Q. Say it again?  I'm sorry—

A. Said we couldn't find the weed.

Q. Uh-huh.

A. So we just didn't let it go by.

Q. You didn't let it go by?

A. Yes.

Q. What does that mean?

A. We couldn't—we couldn't find the weed at the second location.  So we didn't just want to send them and they get it from somewhere else.

Q. Okay.  So you didn't want them to go buy weed from somebody else?

A. Yes.  Yes, sir.

Q. So what—what was—I guess what I'm getting at, Rufus, is—did there come a time where you weren't going to get weed for them, you guys were going to do something else?

A. Yes.  Yes, sir.

Q. Okay.  And was that your idea or was that the defendant's idea?

A. It was the defendant['s] idea.

Q. And what was that idea?

A. To take the money, rob them.

Q. Okay.  And you're referring to Jon and Julie?

A. Yes, sir.

Q. And you—you and the defendant—you were aware that they had some money on them, because they were trying to buy a decent amount of marijuana from you; is that fair?

A. Yes, sir.

Q. Okay.  5 to 10 pounds according to the text messages?

A. Yes.

Q.    And so, Rufus, when did it change?  When did you learn that the defendant was just going to rob them and it wasn't going to be a marijuana sale?  When was that?

A.    Location B [Las Palmas].

Q.    At Location B?

A.    Yes.

Q.    Okay.  Before you got back in the car?

A.    Yes.

Q.    So when you got back in the car with Jon and Julie, you provided Julie with the crack?

A.    Yes, sir.

Q.    And did the defendant meet up with you at that point?

A.    Yes.

Q.    And what did he do when he met up with you?

A.    Got back in the car with me.

*Id*. at 75–77.

So, the group then drove to a third nearby location, on Royal Crest Circle. *Id*. at 21, 78–79.  When they arrived there, Collins parked on the street outside the apartment complex. *Id*. at 22.  Collins gestured for Sheffield and Smith to get out of the car, indicated that he and Kneisl were going to leave and go to a hotel. *Id*.  Smith testified that he remembered Collins and Kneisl saying they were going to go get a hotel room "and call it a day," but Smith and Sheffield did not want them to do that. *Id*. at 78.  Sheffield spoke to Smith, and Smith communicated to Collins to drive into the apartment complex. *Id*. at 22, 78–79.

Collins drove into the apartment complex and parked, and Smith got out of the car and gestured to Collins and Kneisl to wait. *Id*. at 23–25, 80.  Smith waved and walked around a corner of a building. *Id*. at 24–25, 81.  Smith testified that he got out of the car because he knew that Sheffield was going to rob Collins and Kneisl. *Id*. at 79.  Smith walked to a liquor store, where his girlfriend picked him up. *Id*.  As he was walking from the car to the liquor store, Smith heard a gunshot. *Id*. at 81–82.

5

When Smith left, Sheffield stayed in the car with Collins and Kneisl. *Id*. at 24, 26. Kneisl testified that Sheffield "had his arms crossed, and was looking at [them], kind of like with a really weird expression on his face." *Id*. at 24, *see also id*. at 25–26. Kneisl testified:

A.    He was still sitting in the back behind Jon.

Q.    And you said he had his arms crossed?

A.    Yeah.

Q.    What were you—

A.    He was looking like that.

Q.    Sorry.  What were you thinking at that point?

A.    He was really quiet.  He wasn't talking or anything.  He looked at me and Jon, like, he kept looking back and forth between the two of us.

Q.    Were you and Jon talking to each other?

A.    Yes.  I told Jon, I'm like, this is really weird.  He's sitting there.  He's not saying anything.  And Jon's like, yeah, I don't know.

Q.    How long were you just sitting there with him not saying anything, if you can estimate?

A.    Few minutes.  Maybe less than five.

                    *    *    *

A.    I would—you know, we—Jon and I would talk and then I would text on my phone, because we were waiting for Rufus to come back. You know, I'd look out the window and see if he was coming or not. So I would look out the window and see if Rufus was coming.  And I felt, like, a little bit of movement in the car.  And I looked back and that is when I saw Travis had a gun pointed at Jonathan's head.

                    *    *    *

A.    And when I saw the gun at Jonathan's head, Jon's eyes got really big and his—he put his hands up.  Then Travis put the gun in my face, and he put his hand out, his other hand out, like he wanted money.

Q.    When you say he put his hand out, are you talking about Travis?

A.    Yes.

Q.    Do you remember what the gun looked like?

6

A.    It was about this big. It looked kind of like a bronze color. It was pretty small. I thought maybe it was fake. Maybe it was—he was—they were playing a game on us or something.

Q.    When Travis pulled out the gun and pointed it at Jon's head, did he say anything?

*    *    *

A.    You know, by the time I had looked back, it had already happened. By the time I saw the gun, it was already to Jon's head and Jon's eyes got big. That's—and put his hands up. So I don't know if he said anything by the time I had turned around and see—and saw what was going on. If he did say something, I missed it.

Q.    And then he put it to your head next?

A.    When I turned to look Travis in the eye—excuse me. When I turned to look at Travis, he looked at me and that's when he moved his gun to my face. And that's when he, Travis, put his hand out towards me, meaning we assumed he wanted money.

And then when Travis had the gun pointed to my face, Jon made a quick movement, I don't know if it was to throw Travis off, and that's when Travis put the gun back towards Jon and put his hand—Travis's hand on Jon's shoulder when he moved the gun back to face Jon. Should I continue or—

*    *    *

Q.    So you said that Travis put his hand on Jon's shoulder because Jon made a movement?

A.    Yes.

Q.    Do you remember what the movement was?

A.    Because Jon was starting to open the door and maybe Travis thought that he was going to escape. So when he had—when Travis had moved the gun—when Travis had moved the gun back over to Jon and put his—his hand on his shoulder, I saw him mouth the words, Where are you going, where are you going? And Travis seemed maybe he thought that, you know, Jon was trying to escape. So, very clearly, I saw Travis say, Fuck you, and he put—he moved the gun towards Jon's side and shot.

*    *    *

Q.    Okay. Did you see where Jon got shot or did you just see where Travis put the gun?

A.    At first the gun was pointed at Jon's head. And then I saw that he had moved the gun lower down, like towards under his arm. And I saw Jon grip the side of him, his right side, and a really loud bang happened. And then I saw Jon grab his right side. And that's when

7

I screamed, No.  And then he pointed the gun back at me, Travis did, and he was waving it around.

And then I saw some man, I don't know who it was.  He and Travis were talking back and forth—

\* \* \*

THE WITNESS [Kneisl]:  There was someone else.  I don't know who it was that was—that got in the backseat with Travis.  The two of them had—had an exchange of some kind and they both got out of the car and left.

\* \* \*

Q.    Now, I'm sorry to make you go back through this; do you remember when Travis shot the gun, if Jon had the door open?

A.    The door was open.

Q.    Okay.  So he was, at least partially, getting out of the vehicle at the time Travis shot him?

A.    Yes.

Q.    Okay.  And I wanted to talk about this third man; can you describe what he looked like?

A.    I didn't recognize him.  The only thing I remember was that he had on a yellow jacket with long sleeves.  I don't know if there was a hood, but I didn't know who he was.  He wasn't recognizable to me.

Q.    You hadn't seen him at the apartment earlier?

A.    I've—you know, I've really tried to remember to see if that was the same person that we had met at the first apartment that I saw.  I have tried so hard to remember, but I didn't recognize him.

\* \* \*

Q.    And I should have asked you this earlier: Did you see what direction Travis and the third man ran in when they left your vehicle, if you remember?

A.    The third man left out of the—my side, the passenger side and took off and just kind of ran away from the car.  Travis came out of the back side of the driver's side and ran around the back of the car to the same location where we saw Rufus disappear to.

Q.    Did the third man also run that same direction as Rufus, and eventually Travis?

8

    A.    It happened so quickly.  Maybe—maybe they went the same way.  I couldn't be sure about him.

*Id*. at 26–33.

When he was shot, Collins grabbed his right side and spit up blood. *Id*. at 31. After the two men left, Collins told Kneisl to "get me to a hospital." *Id.*  Kneisl got out of the car to help Collins. *Id*. at 32.  Collins slumped out of the car onto his stomach and spit up more blood. *Id*. at 32–33; ECF No. 46-23 at 33–34.  Kneisl yelled for help, and someone dialed 911. ECF No. 46-24 at 33.  Collins died from the gunshot wound. ECF No. 46-25 at 9.

Kneisl and Smith testified at trial; their testimony supported the facts described above. ECF No. 46-24 at 8–64, 65–97.

Orlando Thompson also testified at trial. ECF No. 46-25 at 17–67.  He was an acquaintance of Smith, whom he knew as "Rich;" he occasionally bought marijuana from Smith. ECF No. 46-25 at 18–19.  Thompson testified that before Smith was arrested in connection with these events, Smith appeared at his place to sell him drugs, and was shaking, and kept saying "I fucked up," but did not explain. *Id*. at 19.  Smith testified: "He just said, I fucked up, you know, I'm going to run until I get caught or until everybody else—until they catch everybody else." *Id*.

Thompson testified that after Smith was arrested Smith called him from jail on multiple occasions and had him set up three-way telephone calls with others. *Id*. at 19–24.  Smith warned Thompson to watch his back. *Id*. at 19.  But Smith still did not disclose to Thompson the details surrounding his arrest. *Id*. at 20–21.

Thompson was also acquainted with Sheffield, whom he knew as "Snake," and Sheffield's uncle, whom he knew as "Unc." *Id*. at 22–23.  After Smith's arrest, Sheffield appeared at Thompson's home on more than one occasion. *Id*. at 24–25, 27.  And Sheffield's uncle reached out to Thompson, wanting to "hang out and all this kind of stuff," which was out of the ordinary because Thompson's only connection to "Unc" was that he occasionally paid him for rides. *Id*. at 27–28.  Eventually, because things out of

the ordinary were happening, and because of what he had heard from others, Thompson became concerned for his and his daughter's safety, so he called Crime Stoppers and reported Sheffield, and he moved out of his apartment. *Id*. at 28–34.  But, at that time, Sheffield only knew Sheffield as "Snake" or "Travis," and he was told that he would have to provide a full name before anything could happen. *Id*. at 31–33.

Later, in October 2025, still before Sheffield's arrest, Thompson's car was in the shop, so he called Sheffield's uncle and got a ride to the shop. *Id*. at 33, 39-40. Sheffield's uncle stopped and picked up Sheffield along the way. *Id*. at 41.  During the drive, Sheffield asked about Thompson's communications with Smith, and he asked if Smith had money or if Smith discussed having money with anyone else. *Id*. at 41–42. Thompson answered "no." *Id*.  Based on Sheffield's questioning of Thompson, it appeared that Sheffield did not received any money from the robbery, and he wanted to know if Smith had received any. *Id*. at 62.  Thompson testified that during this conversation on the way to the auto shop, Sheffield confessed that he shot Collins:

Q. And so without telling me what Unc said, was Unc asking the defendant questions?

A. Yes.

Q. And what was the defendant telling Unc about?

A. It started telling him about what had happened between him and Rich [Smith].

Q. Him and Rich, him and Rufus?

A. Yes.

Q. Okay. And what had happened?  What did he say had happened?

A. Well, he said that the—they went to hit a lick for eight or nine racks, and that it went bad.

Q. What does it mean to hit a lick?

A. Hit a lick, it's like a street term for rob someone.

Q. And when you say they were going to hit a lick and hope to get eight or nine racks, what does that mean?  What are eight or nine racks?

A.   8 or 9,000.

Q.   Dollars?

A.   Yes.

Q.   Okay.  And you said he also said that it went bad.  And did he—did the defendant elaborate what that meant?

A.   Yes.

Q.   What was that?

A.   Well, he said that Rich had jumped out of the car and the guy, he got nervous, something—the guy made a sudden move and he got nervous and he shot the guy.  And he tried to shoot the girlfriend, but she either grabbed the gun or pushed the gun down, and he ran after that.

Q.   So the defendant had said that the guy that he ended up shooting had made a movement, defendant got nervous and shot him?

A.   Yeah.

Q.   Tried to shoot the girl, but she did something, hit the gun or something and then he took off?

A.   Yeah.

Q.   So he didn't—didn't shoot the girl?

A.   No.

*  *  *

Q.   Let me ask you this, Orlando: Did you get in the car and call Unc to try to get information from Travis?

A.   No.

Q.   Okay. This wasn't a scheme of yours to get information to tell the police?

A.   No.

Q.   Why did you call Unc?

A.   To pick my car up from the shop.

Q.   This just happened—and this just—you know, you didn't—did you know they were going to pick up Travis?

A.   No.

Q.   After the car ride, did you go and—immediately after the car ride in October, did you go to the police and tell them what you heard?

A.   No.

Q.   Okay.  Why not?

A.   You saying—excuse—

Q.   Did you go and tell the police, the—you called the Crime Stoppers, told you you need to get a name.  Have this ride with—with Unc. After that, did you have a name to give the police?

A.   No.

Q.   Is that why you didn't go and call—go and tell the police?

A.   Exactly.

Q.   Okay.  Eventually, you did go and talk to the police in December 14th, 2015?

A.   December 16th, I think.

Q.   16th?  So what had changed between October and December to cause you to go to the police?

A.   I had learned the name that I needed to know.

Q.   Okay. And how did you come to learn the defendant's name?

A.   Through being friends with Rag Star on Facebook.

Q.   Up until December, had you been friends with Rag Star on Facebook?

A.   No.

Q.   Again, you had told me—you had testified earlier that you had started hanging out with Rag Star more often?

A.   Yes.

Q.   And, eventually, that—that continued up until December, when you became Facebook friends?

A.   Yes.

Q.   And what about that allowed you find out the defendant's name?

A.   Well, searching through Rag Star friends list, his name was right there.

Q.   Okay. And that name was?

A.   Travis Sheffield.

Q.   Okay. At that point, Orlando, you went to the police?

12

A. Yes.

Q. And did you have a conversation with a detective Gillis?

A. Yes.

Q. And, basically, you told him everything you knew?

A. Yes.

Q. After the interview, did you learn that you were actually being given a reward for providing this information?

A. Yes.

Q. What was the reward?

A. It was, like, $2,000 cash.

Q. Prior to the end of that interview, let's say when you first contacted Crime Stoppers, did you know about a reward?

A. No.

Q. When you went to the detectives on—in December, going in the door, did you know that if you told them something good, you were going to get a reward?

A. No.

Q. That came as a surprise to you?

A. Yes.

Q. Did you get in the car with Unc because you were hoping you could find out something to get a reward?

A. No.

Q. And you weren't hanging out with Rag Star all this time because you were hoping to get a reward?

A. No.

Q. Why were you doing it?

A. Because I—once again, I was in fear for my life and my daughter's life.

Q. Thought they were going to come for you next?

A. Yes.

Q.   After you completed the interview with the police where you told Detective Gillis what you knew, did you receive a phone call from Rag Star?

A.   Yes.

Q.   Approximately around what time—what time in—was it in December?

A.   Yes.

Q.   Approximately when in December?

A.   Around December the 21st, I believe.

Q.   Okay.  That conversation with Rag Star, how did it go?

A.   Well, it was—he was basically threatening me.

Q.   Because?

A.   I—well, to my knowledge, I assumed that they had found out that I had went to the police.

\*   \*   \*

Q.   Orlando, the -- the conversation you had with Rag Star, he was threatening you?

A.   Yes.

Q.   Caused you to feel even more fear for your life than previously?

A.   Yes.

Q.   Caused you to actually move again?

A.   Yes.

Q.   Caused you to block his number?

A.   Yes.

Q.   What did it cause you to do with regards to your daughter?

A.   Well, I had to send my daughter away to her mother.

Q.   Does her mom live here?

A.   No.

Q.   Where does her mom live?

A.   In Utah.

Q.   How did that make you feel?

14

A.   Well, I've raised her my whole life so it was—it was a real hurt.

Q.   But you thought that her safety was better served in Utah than with you?

A.   Yes.

Q.   And, again, is that the reason why you even came forward in the first place and involved the police in your life?

A.   Yes.

Q.   Did you want to come here and testify today?

A.   No.

Q.   Did you want to go to the police?

A.   No.

Q.   Did you want to be involved in this entire thing?

A.   Not at all.

*Id*. at 42–49.

Sheffield appealed from the judgment of conviction, and the Nevada Supreme Court affirmed on July 1, 2019. ECF No. 46-50 (opening brief on appeal); ECF No. 43-11 (order of affirmance).

Sheffield then filed a post-conviction petition for writ of habeas corpus in the state district court. ECF No. 43-23.  Counsel was appointed for Sheffield (*see* ECF Nos. 43-19, 43-20, 43-21), and, with counsel, Sheffield filed supplemental points and authorities in support of his petition (ECF No. 43-25).  The state district court denied the petition in a written order filed on March 23, 2021. ECF No. 43-36.  Sheffield appealed, and the Nevada Court of Appeals affirmed on March 4, 2022. ECF No. 43-46 (opening brief on appeal); ECF No. 43-50 (order of affirmance).

Sheffield initiated this federal habeas corpus action, *pro se*, on April 5, 2022. ECF No. 1.  The Court granted Sheffield's motion for appointment of counsel and appointed counsel to represent him. ECF No. 6.  With counsel Sheffield filed an amended petition on August 5, 2023, and he filed a second amended petition on

December 6, 2023.  In his second amended petition—his operative petition—Sheffield asserts the following claims of violations of his federal constitutional rights:

1.      The evidence adduced at trial was insufficient to prove Sheffield's guilt beyond a reasonable doubt for the death of Jonathan Collins.

2.      Sheffield was denied effective assistance of trial counsel.

A.      "Failure to test fingerprints of pill bottle filled with bullets."

B.      "Failed to address four jury questions."

C.      "Failure to mention alibi witness JaVonique Sheffield during closing arguments.

D.      "Failure to obtain an expert on eyewitness identification."

E.      "Failure to file a meritorious motion for a pretrial lineup."

F.      "Failure to object to prosecutorial misconduct during closing argument."

G.      "Failure to object to the testimony of Dr. Jennifer Corneal."

H.      "The cumulative effect of counsel's errors prejudiced Sheffield."

3.      Sheffield was denied his right to confrontation.

ECF No. 33.

Respondents filed a motion to dismiss, and on December 1, 2024, the Court granted that motion in part and denied it in part. ECF No. 58.  The Court dismissed Ground 3 of the second amended petition as procedurally defaulted but denied the motion in all other respects. *Id*.

Respondents then filed an Answer, responding to Sheffield's remaining claims, and Sheffield filed a Reply. ECF Nos. 65, 79.  Sheffield also filed a motion for leave to conduct discovery and the parties fully briefed that motion. ECF Nos. 66, 70, 71.

III.    **Governing Standards of Review**

A.      **Review under the Antiterrorism and Effective Death Penalty Act**

The Antiterrorism and Effective Death Penalty Act (AEDPA) provides the legal standards for consideration of claims adjudicated on their merits in state court:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is contrary to clearly established Supreme Court precedent, within the meaning of § 2254(d)(1) "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court's decision is an unreasonable application of clearly established Supreme Court precedent under § 2254(d)(1) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous ... [rather] [t]he state court's application of clearly established law must be objectively unreasonable." *Id*. (quoting *Williams*, 529 U.S. at 409–10, 412) (internal citation omitted).

The Supreme Court has instructed that "a state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. at 102 (citing *Lockyer*, 538 U.S. at 75); *see also*

*Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult-to-meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." (internal citations omitted)). The petitioner carries the burden of proof. *See Cullen*, 563 U.S. at 181 (citing *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002)).

**B.      Standards for Consideration of Procedurally Defaulted Claims**

A federal court may not grant relief on a habeas corpus claim that has not been exhausted in state court. *See* 28 U.S.C. § 2254(b).  The exhaustion doctrine is based on the policy of federal-state comity and is designed to give state courts the initial opportunity to correct alleged constitutional deprivations. *See Picard v. Conner*, 404 U.S. 270, 275 (1971).  To exhaust a claim, a petitioner must fairly present that claim to the State's highest court and give that court the opportunity to address and resolve it. *See Duncan v. Henry*, 513 U.S. 364, 365 (1995) (per curiam); *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 10 (1992).  The "fair presentation" requirement is satisfied when the claim has been presented to the highest state court by describing the operative facts and the legal theory upon which the federal claim is based. *See Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Batchelor v. Cupp*, 693 F.2d 859, 862 (9th Cir.1982), *cert. denied*, 463 U.S. 1212 (1983).

In *Coleman v. Thompson*, the Supreme Court held that a state prisoner who fails to comply with the State's procedural requirements in presenting claims is barred by the adequate and independent state ground doctrine from obtaining a writ of habeas corpus in federal court. *Coleman*, 501 U.S. 722, 731–32 (1991) ("Just as in those cases in which a state prisoner fails to exhaust state remedies, a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance.").  Where such a procedural default constitutes an adequate and independent state ground for denial of habeas corpus, the default may be excused only if "a constitutional violation has probably resulted in the conviction of one who is actually

innocent," or if the prisoner demonstrates cause for the default and prejudice resulting from it. *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

To demonstrate cause for a procedural default, the petitioner must "show that some objective factor external to the defense impeded" his efforts to comply with the state procedural rule. *Id*. at 488.  For cause to exist, the external impediment must have prevented the petitioner from raising the claim. *See McCleskey v. Zant*, 499 U.S. 467, 497 (1991).  With respect to the prejudice prong, the petitioner bears "the burden of showing not merely that the errors [complained of] constituted a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire [proceeding] with errors of constitutional dimension." *White v. Lewis*, 874 F.2d 599, 603 (9th Cir. 1989) (citing *United States v. Frady*, 456 U.S. 152, 170 (1982)).

In *Martinez v. Ryan*, the Supreme Court ruled that ineffective assistance or lack of post-conviction counsel may serve as cause, to overcome the procedural default of a claim of ineffective assistance of trial counsel. *Martinez*, 566 U.S. 1 (2012).  Under *Martinez*, to overcome the procedural default, the petitioner must demonstrate that (1) the claim of ineffective assistance of trial counsel is substantial; (2) ineffective assistance or absence of post-conviction counsel was the cause of the default; (3) the postconviction proceedings were the initial review proceedings for the ineffective assistance of trial counsel claim; and (4) state law requires, or practically requires, that the claim be raised in the initial postconviction proceedings. *Trevino v. Thaler*, 569 U.S. 413, 423 (2013).

If the petitioner overcomes the procedural default of a claim, by showing cause and prejudice, the claim—not adjudicated on its merits in state court—is adjudicated *de novo* in the federal habeas action. *Patsalis v. Shinn*, 47 F.4th 1092, 1097–98 (9th Cir. 2022).

### C.     Standards for Evaluating Ineffective Assistance of Counsel Claims

"[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance." *Burt v. Titlow*, 571 U.S. 12, 24 (2013).

A petitioner claiming ineffective assistance of counsel must demonstrate (1) the attorney's "representation fell below an objective standard of reasonableness[;]" and (2) the attorney's deficient performance prejudiced the petitioner such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.  The errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*.  It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id*. at 693.

For *Strickland*'s performance prong, a petitioner claiming ineffective assistance of counsel "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id*. at 690.  The issue is not what counsel might have done differently but whether counsel's decisions were reasonable from his or her perspective at the time. *Id*. at 689–90.  In considering such claims, a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*.

In considering counsel's performance in the context of a claim ineffective assistance of counsel adjudicated in state court and governed by § 2254(d), the review is "doubly deferential," because the court must apply deference under both § 2254(d) and *Strickland*. *Clark v. Sweeney*, 607 U.S. 7, 10 (2025) (per curiam).  "[A] federal court may grant relief only if *every* 'fairminded juris[t]' would agree that *every* reasonable lawyer would have made a different decision." *Dunn v. Reeves*, 594 U.S. 731, 739–40 (2021) (quoting *Harrington*, 562 U.S. 86, 101 (2011) (emphasis in original).

## IV. Discussion

### A. Ground 1

In Ground 1 of his second amended petition, Sheffield claims that his federal constitutional rights were violated because "the evidence adduced at trial was insufficient to prove Sheffield's guilt beyond a reasonable doubt for the death of Jonathan Collins." ECF No. 33 at 10.

"The Constitution prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 309 (1979) (citing *In re Winship*, 397 U.S. 358 (1970)). When considering a claim of insufficiency of the evidence, the court must view the evidence presented at trial in the light most favorable to the prosecution. *Boyer v. Belleque*, 659 F.3d 957, 960 (9th Cir. 2011). The credibility of witnesses is beyond the scope of the review. *Schlup v. Delo*, 513 U.S. 298, 330 (1995). The question is whether, viewing the evidence in the light most favorable to the prosecution, "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 324.

When a federal court "assess[es] a sufficiency of evidence challenge in the case of a state prisoner seeking federal habeas corpus relief subject to the strictures of AEDPA, there is a double dose of deference that can rarely be surmounted." *Boyer*, 659 F.3d at 964; *see also Long v. Johnson*, 736 F.3d 891, 896–97 (9th Cir. 2013). First, the *Jackson* standard is deferential to the findings of the jury. *Boyer*, 659 F.3d at 964. And second, the state court's determination that the evidence was sufficient is entitled to deference under the AEDPA standard. *Id*. at 964–65.

Sheffield asserted this insufficiency of evidence claim on his direct appeal, and the Nevada Supreme Court denied relief on the claim, ruling as follows:

> Sheffield now appeals his first degree murder conviction based on insufficient evidence.
>
> Sheffield's complaints largely stem from his mistaken belief that the testimony of the prosecution witnesses, as laid out above, was insufficient to support his conviction, given what he perceives as an "utter lack of physical evidence" tying him to the crime scene. But, Sheffield

21

appears to now *admit* that he was present at the scene, seemingly negating the need for direct evidence proving the same. *Purgess v. Sharrock*, 33 F.3d 134, 144 (2d Cir. 1994) ("Counsel's statement of fact [in appellate brief] constituted an admission of a party."); *see Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 227 (9th Cir. 1988) (holding that "statements of fact contained in a brief *may* be considered admissions of the party in the discretion of the district court").  And, even setting Sheffield's apparent admissions aside, this court has made plain that eyewitness testimony *is* sufficient to sustain a conviction, even without physical evidence, provided that, "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Koza v. State*, 100 Nev. 245, 250, 681 P.2d 44, 47 (1984) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

The essential elements of [first-degree] murder are established by evidence of a "willful, deliberate and premeditated killing." *Byford v. State*, 116 Nev. 215, 234, 994 P.2d 700, 713 (2000) (quoting NRS 200.030(1)(a)).  Put differently, the prosecution must demonstrate (1) the accused's intent to kill, (2) his having weighed different courses of action "with coolness and reflection," and (3) his having ultimately arrived at a determination to kill. *Byford*, 116 Nev. at 235–37, 994 P.2d at 714 (internal quotation marks omitted).  This court has made plain that "[t]he law does not undertake to measure ... the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated." *Id*. at 237, 994 P.2d at 714–15. Indeed, "[i]t may be as instantaneous as successive thoughts of the mind." Id. at 237, 994 P.2d at 714.

Here, the prosecution presented testimony that Sheffield shot Collins in the torso with a .32 caliber firearm, at extremely close range, such that the bullet severed Collins's aorta and punctured his lungs.  A medical examiner and coroner confirmed the weapon caliber and its proximity to Collins' torso at the time the shot was fired.  A reasonable jury could certainly have determined that such action was undertaken with intent to kill. *See Valdez v. State*, 124 Nev. 1172, 1204, 196 P.3d 465, 486 (2008) (holding that "the jury may infer intent to kill from the defendant's use of a deadly weapon").

With regard to premeditation and deliberation, Kneisl testified that, prior to the shooting, Sheffield sat in the backseat with his arms folded for several minutes, before ultimately pulling out a gun that he had apparently brought with him.  Kneisl further testified that after brandishing the gun and demanding money, Sheffield put his hand on Collins's shoulder and the gun to Collins's side, saying, "F*** you," before firing the fatal shot.  No evidence was presented that Sheffield's passions were somehow aroused during this period, indeed Kneisl testified that Sheffield "was real quiet.  He wasn't talking or anything."  A reasonable jury could have determined, based on this testimony, that Sheffield had taken time to coolly deliberate, settling on a design to kill Collins.  *See Briano v. State*, 94 Nev. 422, 425, 581 P.2d 5, 7 (1978) (evidence of deliberation and premeditation may be circumstantial and includes "the sequence of events which leads to the death of the victim").

Rather than seriously debating the sufficiency of the substance of this testimony, Mr. Sheffield attempts to attack the prosecution witnesses'

credibility, based on (1) [Smith] receiving a favorable plea deal, (2) [Thompson] and Kneisl having had some relationship with [Smith], (3) [Thompson] lacking a receipt for car repairs necessitating the ride during which he testified Sheffield confessed, (4) the passage of time between the crime and Kneisl's identification of Sheffield, (5) Kneisl's uncertainty as to the shooter's hairstyle due to his having worn a bandana, and (6) Kneisl's prior conviction for wrongfully obtaining food stamp assistance.  To the extent these issues can even be said to bear on the witnesses' credibility, they were fully developed at trial, in person, before the jury.  And "[i]t is the jury's function, not that of the court ... to determine the credibility of the witnesses." *McNair v. State*, 108 Nev. 53, 56, 825 P.2d 571, 573 (1992).

The jury weighed the corroborating statements given by the various prosecution witnesses, and apparently deemed them credible. This court will not replace the fact-finders' judgment with its own. *See id*.[1]

----------------------------------------------

[1] Sheffield attempts to raise a handful of other challenges to his conviction, but fails to cogently argue them, much less offer sufficient legal support for the same.  We therefore decline to analyze their merits here. *Maresca v. State*, 103 Nev. 669, 673, 748 P.2d 3, 6 (1987).

ECF No. 43-11 at 3–5 (emphasis in original).

The Nevada Supreme Court's ruling was clearly a reasonable application of *Jackson*.  The evidence at trial, summarized in Part II, *supra*, was sufficient for reasonable jurors to find Sheffield guilty of first-degree murder.

Sheffield argues that no physical evidence connected him to the crime and that there was a "possible alternative perpetrator whom the state of Nevada failed to investigate or identity." ECF No. 33 at 11–13.  But there was ample evidence placing Sheffield at the scene of the crime—the testimony of Kneisl and Smith primarily.  And the alleged existence of a "possible alternative perpetrator" does not affect the *Jackson* analysis. The *Jackson* analysis is not about evidence that was not presented at trial and that might or might not exist; the *Jackson* analysis is about the evidence that was presented.

As in state court, the heart of Sheffield claim here is his argument that the State's key witnesses were not credible.  He argues that Kneisl's identification of him as the person who shot and killed Collins was not credible—despite the significant amount of time she spent in Sheffield's presence and the fact that she was only a few feet from the

shooter, in the car, when Collins was shot. *Id*. at 13–14.  Sheffield argues that Smith's testimony was not credible because he only pointed to Sheffield after he received a generous plea offer. *Id*. at 14–16.  And Sheffield argues that Thompson's testimony that he heard Sheffield confess "strained credibility." *Id*. at 16–20.  Those arguments ignore well-settled law regarding the analysis of insufficiency of evidence claims; they challenge the credibility of witnesses.  The credibility of the testimony of Kneisl, Smith and Thompson was for the jury to decide, and it is beyond the purview of this Court in addressing Sheffield's insufficiency of evidence claim.  "Although the evidence presented at trial could yield an alternative inference, we 'must respect the exclusive province of the [jury] to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts.'" *Long*, 736 F.3d at 896 (quoting *United States v. Archdale*, 229 F.3d 861, 867 (9th Cir. 2000)) (alteration in original).

In short, Ground 1 is meritless.  The Nevada Supreme Court's ruling on the claim was not contrary to, or an unreasonable application of, *Jackson* or any other clearly established federal law, as determined by the Supreme Court of the United States; nor was it an unreasonable determination of the facts in light of the evidence presented.  The Court denies relief on Ground 1.

### B.    Ground 2A

In Ground 2, Sheffield claims that he was denied his federal constitutional right to effective assistance of trial counsel. ECF No. 33 at 20–32.  Ground 2 includes eight subparts, designated Grounds 2A–2H.  In Ground 2A, Sheffield claims that his trial counsel was ineffective for failing "to test fingerprints of pill bottle filled with bullets." *Id*. at 20.  Sheffield explains:

> Police recovered a pill bottle container at the first apartment [the Cambridge Street apartment] with .32 caliber cartridges.  The State's firearms analyst testified the shooter used .32 caliber ammunition in this case.  Police, however, failed to take fingerprints from the pill bottle.  [Kneisl] testified the shooter smoked weed with her, Collins, and Smith at the first apartment.  It's reasonable to believe the ammunition in the pill bottle was used by the shooter.  Had trial counsel filed a motion to

fingerprint the pill bottle, trial counsel could have persuaded [the jury] whoever handled the pill bottle was the actual shooter.  After all, during deliberations, the jury sent a note asking about fingerprints on the pill bottle.  The note demonstrated the jury had doubts about the identity of the shooter and thought the ownership of the pill bottle and .32 caliber cartridges was important.  Thus, trial counsel was ineffective for failing to test it.

*Id*. (footnotes omitted).

Sheffield did not assert this claim in state court.  Rather, his position is that "[t]his claim is new, technically exhausted, and procedurally defaulted, but Sheffield overcomes the default under *Martinez v. Ryan*." *Id*.  In ruling on Respondents' motion to dismiss, the Court deferred the question whether Ground 2A is subject to denial as procedurally defaulted. ECF No. 58 at 10–11.

Sheffield does not make a showing under *Martinez* to excuse the procedural default.  This is because Sheffield does not make any colorable argument that any result of fingerprint testing of the pill bottle could have benefitted the defense or that it could have had any impact on the jury's verdict.

The pill bottle was found at the Cambridge Street apartment, not at the scene of the shooting. ECF No. 33 at 20.  Sheffield did not live at that apartment. ECF No. 46-24 at 70.  If Sheffield's fingerprints were found on the pill bottle, that would not have been exculpatory; that would have tended to inculpate Sheffield.  If someone else's fingerprints were found on the pill bottle, that would not have been exculpatory of Sheffield, because it could easily have been that someone else—someone else who visited or lived at the apartment—handled it.  Sheffield points to no support for his argument that "[i]t's reasonable to believe the ammunition in the pill bottle was used by the shooter;" the Court sees no reason to believe that. So, there simply was nothing to be gained by Sheffield's counsel having the pill bottle fingerprinted; and there was reason—possible further incrimination of Sheffield, if Sheffield happened to touch the pill bottle when he was at the apartment—for counsel not to.

There is no showing that this claim of ineffective assistance of counsel is substantial, that Sheffield's counsel performed unreasonably in not raising it in

Sheffield's state habeas action, or that Sheffield was prejudiced. Ground 2A is denied as procedurally defaulted.

### C.    Ground 2B

Ground 2B is another claim of ineffective assistance of trial counsel that Sheffield concedes is procedurally defaulted and subject to denial on that ground, unless he can overcome the procedural default under *Martinez*. *See* ECF No. 33 at 20–21; ECF No. 58 at 10–11. In Ground 2B, Sheffield claims his trial counsel was ineffective because he "fail[ed] to address four jury questions." ECF No. 33 at 20–23. Sheffield explains:

> During deliberations, the jury sent a note to the court with four questions they wanted answered before [they] made their decision:
>
> Number one, who lived in the apartment (3601 Cambridge, #229) (first apartment)?
>
> Number two, is defendant right or left-handed?
>
> Number three, where was Julie [Kneisl]'s purse at the time of the shooting?
>
> Number four, were fingerprints taken of the pill bottle with the bullets in it found at first apartment? If so, who?
>
> Trial counsel conceded he couldn't supplement the record with new evidence at that point.
>
> By asking these evidentiary questions, the jurors expressed doubt on Sheffield's guilt. Trial counsel was deficient for failing to address the juror's questions during trial. Had trial counsel answered the questions during trial, there is a reasonable probability of a different outcome.

*Id*. at 21 (footnotes omitted).

Sheffield makes no showing under *Martinez* such that the procedural default of this claim should be excused. Sheffield does not make a colorable argument that his trial counsel could have taken any action with regard to any of these four subjects that could have benefitted the defense.

As for the question who lived in the Cambridge Street apartment, there was testimony that Sheffield did not live there (ECF No. 46-24 at 70 (testimony of Smith)), and Sheffield provides no cogent explanation why it mattered who did in fact live there. As for the question whether there were fingerprints on the pill bottle, as is discussed in

Part IVB, *supra*, regarding Ground 2A, Sheffield does not explain how it could have benefitted the defense if someone's fingerprints—other than his—were found on the pill bottle. As for the question whether Sheffield was right- or left- handed—Sheffield does not say (*see* ECF No. 33 at 22–23; ECF No. 79 at 31—Sheffield does not explain how it would have mattered either way; there was no evidence clearly establishing the precise positions of Collins and the shooter in the car when Collins was shot. And, as for the question where Kneisl's purse was at the time of the shooting, Sheffield does not explain why that would matter either; whether or not the purse was taken during or after the shooting was immaterial with respect to the question whether Sheffield was guilty of first-degree murder.

So, the Court finds that this claim of ineffective assistance of counsel is insubstantial, that Sheffield's counsel did not perform unreasonably in not raising it in Sheffield's state habeas action, and that Sheffield was not prejudiced. Ground 2B is denied as procedurally defaulted.

### D.    Ground 2C

In Claim 2C, Sheffield claims that his trial counsel was ineffective because he "fail[ed] to mention alibi witness JaVonique Sheffield during closing arguments." ECF No. 33 at 23–24. Sheffield claims:

> For his defense, trial counsel presented Javonique Sheffield who testified on the day of the shooting, May 11, 2015, Sheffield was home with her all day. During closing arguments, however, trial counsel failed to mention this alibi defense. In rebuttal closing arguments, the State pounced on trial counsel's failure to mention the alibi defense, arguing [that] trial counsel's neglect meant that Javonique lacked credibility.

*Id*. at 23 (footnotes omitted).

In the ruling on the motion to dismiss, the Court determined that this claim is technically exhausted but subject to the procedural default doctrine. ECF No. 58 at 1. The Court stated in that order that Sheffield could choose to argue in his merits briefing that the procedural default should be excused under *Martinez*, and Sheffield has attempted to do so. *Id*.; *see also* ECF No. 79 at 32–33.

27

The Court, however, finds that this claim is insubstantial, that Sheffield's counsel did not perform unreasonably in not asserting it in his state habeas action, and that Sheffield was not prejudiced. Javonique was apparently Sheffield's girlfriend when the shooting occurred, and she testified that Sheffield was with her at the time of the shooting. *See* ECF No. 46-25 at 94–117. But her actual testimony was as follows:

Q.    Okay. Do you remember—could you tell us where he [Sheffield] was approximately May 11th of 2015 [the date of the shooting]?

A.    From my knowledge, he was with me.

Q.    And how would you know that?

A.    Because, basically, he—I had a lot of things going on around that time and he kind of brung it to my remembrance, because it was when I just moved into my new place at that spot. And that's when I was just getting a job at the WalMart. And that's when, like, basically, I was just getting a schedule there. So it was varies and I didn't have to work often. So that's how I remembered it was around that time.

Q.    And was he with you several days around that time?

A.    Yes, he was. He was living with me. He was—we was actually at the house for about a good four days without doing anything.

Q.    And were you working at that time?

A.    Yes, I was.

Q.    And when you worked at WalMart, what was your shift?

A.    It was varies. It switched.

Q.    Do you remember what your shift was around that time?

A.    No, I don't.

Q.    And do you remember if you were working on May 11th?

A.    I know I was not working on May 11th. I know that for a fact. I was off for about two or three days in a row.

Q.    And—and how do you know you weren't working on May 11th?

A.    Because that was the day, like, we was just chilling. Like, you know, like, it was around that whole week. That's how I know it was, like, the day of May 11th he was with me. Because he was with me for that whole week of not doing anything.

Q.     Was he with you all day?

A.     Yes.

ECF No. 46-25 at 96–97.  Furthermore, on cross-examination it was revealed that, at the time of the shooting, Sheffield was in a relationship with another woman; that Javonique and Sheffield did not get married until just a few months before Sheffield's trial, more than two years after the shooting; and that Javonique never told law enforcement that Sheffield was with her on the day of the shooting. *See* ECF No. 46-25 at 98, 100, 111–14, 116.  Sheffield points to no other evidence supporting his alibi, besides Javonique's testimony.

Given Javonique's testimony—which is on its face, at best, weak evidence to support an alibi—and given there was no other evidence supporting an alibi, this Court determines that it made no difference that Sheffield's counsel did not mention Javonique's testimony in his closing arguments.  The Court finds that this claim of ineffective assistance of counsel is insubstantial, that Sheffield's counsel performed reasonably in not raising it in Sheffield's state habeas action, and that Sheffield was not prejudiced.  Ground 2C is denied as procedurally defaulted.

**E.     Ground 2D**

In Claim 2D, Sheffield claims that his trial counsel was ineffective because he "fail[ed] to obtain an expert on eyewitness identification." ECF No. 33 at 25–27.

Sheffield asserted this claim in his state habeas action. ECF No. 43-25 at 9–11 (supplemental points and authorities in support of petition); ECF No. 43-46 at 32–36 (opening brief on appeal).  The Nevada Court of Appeals affirmed the denial of relief on the claim on its merits. ECF No. 43-50 at 3–4.  Therefore, this Court's consideration of this claim is governed by the deferential AEDPA standard.

The Nevada Court of Appeals' ruling was as follows:

… Sheffield claimed counsel was ineffective for failing to retain an eyewitness expert.  Sheffield claimed that the in-court identification made by the victim's girlfriend [Kneisl] was highly suggestive and an eyewitness expert could have explained why.  The victim's girlfriend, who was able to view her boyfriend's killer for a period of time in the car, identified Sheffield

as the perpetrator at the preliminary hearing and at trial.  Further, Sheffield's codefendant also testified against him at trial, stating he left Sheffield in the victim's car to rob the victim and heard a gunshot as he walked away.  Finally, another witness testified that Sheffield told him he killed the victim after robbing him.  Given this evidence, Sheffield failed to demonstrate a reasonable probability of a different outcome at trial had counsel hired an eyewitness expert.  Therefore, we conclude the district court did not err by denying this claim without first conducting an evidentiary hearing.

*Id*.

In presenting this claim in this case, Sheffield relies on a June 5, 2023, report of Dr. Cara Laney PhD, an expert on eyewitness identifications. *See* ECF No. 33 at 25–27; *see also* ECF No. 34-34 (Dr. Laney's report).  That report was not presented in state court; in fact, it was not prepared until over a year after Sheffield's state habeas action had concluded.  "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 181; *see also* 28 U.S.C. § 2254(e)(2); *Murray v. Schriro*, 745 F.3d 984, 998 (9th Cir. 2014) ("Along with the significant deference AEDPA requires us to afford state courts' decisions, AEDPA also restricts the scope of the evidence that we can rely on in the normal course of discharging our responsibilities under § 2254(d)(1).").  The Ninth Circuit has instructed that "*Pinholster* and the statutory text make clear that this evidentiary limitation is applicable to § 2254(d)(2) claims as well." *Gulbrandson v. Ryan*, 738 F.3d 976, 993 n.6 (9th Cir. 2013) (citing § 2254(d)(2) and *Pinholster*, 563 U.S. at 185 n.7); *see also Shoop v. Twyford*, 596 U.S. 811, 819 (2022) ("AEDPA ... restricts the ability of a federal habeas court to develop and consider new evidence. Review of factual determinations under § 2254(d)(2) is expressly limited to 'the evidence presented in the State court proceeding.'").  Sheffield states: "Sheffield sought an eyewitness identification expert during post-conviction, but the state court denied his petition without an evidentiary hearing." ECF No. 33 at 25.  In support of that assertion, he cites "7/22/2020 Supplemental Points and Authorities in Support of Writ of Habeas Corpus for Post Conviction Relief and Request for Evidentiary Hearing at 30" [ECF No. 43-25 at 31]. *Id*. at 25 n.129.  But there, while Sheffield did request an evidentiary

hearing, he did not "[seek] an eyewitness identification expert," and he did not indicate to the court that he had retained any such expert or that any such expert had rendered an opinion regarding Kneisl's eyewitness identification. *See* ECF No. 43-25 at 31. Respondents raised this issue in their Answer, arguing that Dr. Laney's report "should not be considered because Sheffield failed to present [it] to the Nevada Supreme Court on [his] habeas appeal." ECF No. 65 at 27 n.11. Sheffield did not respond to that argument in his Reply. *See* ECF No. 79. The Court determines that Dr. Laney's report is inadmissible in support of Sheffield's petition, under 28 U.S.C. § 2254(e)(2) and *Pinholster*. Sheffield does not make any argument that he can meet the requirements of § 2254(e)(2), such that the Court can consider Dr. Laney's report. The Court does not consider Dr. Laney's report.

Applying the standard of review mandated by 28 U.S.C. § 2254(d), this Court determines that the Nevada Court of Appeals' ruling, denying relief on the claim in Ground 2D, was not erroneous beyond any fairminded disagreement. Given the ample opportunity Kneisl had to observe Sheffield, and given the testimony of Smith and Thompson, there is no reasonable probability of a different outcome at trial had counsel hired an eyewitness identification expert. The Nevada Court of Appeals' ruling was not contrary to, or an unreasonable application of, *Strickland* or any other Supreme Court precedent, and it was not based on an unreasonable determination of the facts in light of the evidence presented. The Court denies relief on Ground 2D.

### F.    Ground 2E

In Claim 2E, Sheffield claims that his trial counsel was ineffective because he "fail[ed] to file a meritorious motion for a pretrial lineup." ECF No. 33 at 25–27.

Sheffield asserted this claim in his state habeas action. ECF No. 43-25 at 12–14 (supplemental points and authorities in support of petition); ECF No. 43-46 at 37–40 (opening brief on appeal). The Nevada Court of Appeals affirmed the denial of relief on the claim on its merits. ECF No. 43-50 at 4. Therefore, this Court's consideration of this claim is governed by the deferential AEDPA standard.

The Nevada Court of Appeals' ruling was as follows:

> … Sheffield claimed counsel was ineffective for failing to file a motion for a pretrial lineup. Sheffield again claimed that the in-court identification made by the victim's girlfriend [Kneisl] was highly suggestive, and he argued that a pretrial lineup would have shown that the victim's girlfriend could not actually identify him. Sheffield failed to demonstrate the district court had the authority to grant a motion for pretrial lineup or that his motion would have been granted. As stated above, the victim's girlfriend identified him at two different court hearings, Sheffield's codefendant testified against him, and Sheffield confessed to the killing to another witness. Thus, Sheffield failed to demonstrate counsel's performance was deficient or a reasonable probability of a different outcome at trial had counsel filed the motion. Therefore, we conclude the district court did not err by denying this claim without first conducting an evidentiary hearing.

ECF No. 43-50 at 4. This was a reasonable ruling.

Regarding the Nevada Court of Appeals' statement that "Sheffield failed to demonstrate the district court had the authority to grant a motion for pretrial lineup or that his motion would have been granted," Sheffield makes no argument that the Nevada Court of Appeals was in error, or that there was in fact authority under Nevada law to grant such a motion. *See* ECF No. 33 at 25–27; *see also* ECF No. 79 (Sheffield's Reply). Nor does Sheffield make any argument that there was any federal constitutional right to a pretrial lineup. *See id*. In fact, the Ninth Circuit Court of Appeals has instructed that there is no such right:

> … [T]he United States Supreme Court has never held that a criminal defendant has a constitutional right to a pretrial lineup. Further, the Ninth Circuit has rejected explicitly any constitutional dimension to a defendant's request for a pretrial lineup. *See United States v. Robertson*, 606 F.2d 853, 857–58 (9th Cir.1979) ("An accused has no absolute or constitutional right to a lineup.").

*Morris v. Giurbino*, 162 Fed.App'x. 769, 771 (9th Cir. 2006). Therefore, this Court determines that Sheffield trial counsel did not perform unreasonably in not requesting a pretrial lineup.

Furthermore, the Nevada Court of Appeals reasonably determined that, given the evidence at trial, even if Sheffield's trial counsel had made a motion for a pretrial lineup, there is no reasonable probability of a different outcome at trial.

The Nevada Court of Appeals' ruling was not contrary to, or an unreasonable application of, *Strickland* or any other Supreme Court precedent, and it was not based on an unreasonable determination of the facts in light of the evidence presented. The Court denies relief on Ground 2E.

### G.   Ground 2F

In Claim 2F, Sheffield claims that his trial counsel was ineffective because he "fail[ed] to object to prosecutorial misconduct during closing argument." ECF No. 33 at 28–30.

Sheffield asserted this claim in his state habeas action. ECF No. 43-25 at 21–25 (supplemental points and authorities in support of petition); ECF No. 43-46 at 50–55 (opening brief on appeal). The Nevada Court of Appeals affirmed the denial of relief on the claim on its merits. ECF No. 43-50 at 6–7. Therefore, this Court's consideration of the claim is governed by the deferential AEDPA standard.

Sheffield claims that his trial counsel unreasonably failed to object to the following statement of the prosecutor during the State's opening closing argument:

> How about Rufus [Smith]? Now, Rufus, as we've talked about—you know, we're not trying to hide this. He was involved. He pled guilty to two felonies. He's doing up to 15 years in prison and he has to testify truthfully. He knew the defendant for a while. He's not going to be confused about who he is or who was in the car.

*Id*. at 28–29; *see also* ECF No. 46-28 at 24. Sheffield also points to the following statements of the prosecutor, in the State's rebuttal closing argument:

> Consider this: Consider Julie's [Kneisl's] motive for picking the wrong person. She even told you the first time she saw the lineup, she didn't circle anyone. She's not going to guess. She's not going to get it wrong. Her boyfriend is the one who died. Don't you think she has more incentive than anybody else to make sure that that person is correctly identified? Otherwise, he's still out there running around.
>
>         *   *   *
>
> All he [Smith] was asked to do, ladies and gentlemen, is tell the truth in regards to testifying, whatever that may be. And you got to see him. He was in here, in his prison clothes and chains, testifying for you. Did he look like this was—he had just, you know—this was the last part of that great deal he got. Did he seem excited and happy to be here? Did he seem like he was just itching to give me answers? Or was it like pulling

> teeth to get him to tell me what happened?  He answered the questions. And you certainly saw how he answered them.

*Id*. at 29–30; ECF No. 46-28 at 52–53, 58.  Sheffield claims that this was improper vouching. ECF No. 33 at 29–30.

"Vouching consists of placing the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggesting that information not presented to the jury supports the witness's testimony." *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993).  Several factors are assessed in determining whether there was improper vouching:

> the form of vouching; how much the vouching implies that the prosecutor has extra-record knowledge of or the capacity to monitor the witness's truthfulness; any inference that the court is monitoring the witness's veracity; the degree of personal opinion asserted; the timing of the vouching; the extent to which the witness's credibility was attacked; the specificity and timing of a curative instruction; the importance of the witness's testimony and the vouching to the case overall.

*Id*. at 1278.

The Nevada Court of Appeals' ruling, regarding Sheffield's claim that his counsel failed to object to prosecutorial vouching, was as follows:

> … Sheffield argued counsel was ineffective for failing to object to improper witness vouching by the State.  "[V]ouching occurs when the prosecution places the prestige of the government behind the witness by providing personal assurances of the witness's veracity." *Browning v. State*, 120 Nev. 347, 359, 91 P.3d 39, 48 (2004).  Sheffield argued in closing that the victim's girlfriend was not truthful.  In rebuttal, the State argued regarding the victim's girlfriend, "She's not going to guess.  She's not going to get it wrong" because this was her boyfriend.  The State did not place the prestige of the government behind the witness's veracity.  Thus, Sheffield failed to demonstrate counsel's performance was deficient for failing to object or a reasonable probability of a different outcome had counsel objected.  Therefore, we conclude the district court did not err by denying this claim without first conducting an evidentiary hearing.

ECF No. 43-50 at 7.

The Nevada Court of Appeals' ruling was reasonable. The prosecutors' statements were not improper vouching.  The prosecutors did not claim or imply that they had extra-record knowledge of, or the capacity to monitor, the witnesses' truthfulness.  And the prosecutors did not purport to express personal opinions about the witnesses' testimony.  Furthermore, even if one could argue that the prosecutors'

statements were improper vouching, the Nevada Court of Appeals reasonably ruled that there was no reasonable probability of a different outcome had counsel objected.

Sheffield also points to the following statement of the prosecutor in the State's rebuttal closing argument:

> And look, he [Smith] was originally charged with the murder. That's not a secret that we've been keeping from you. But when you look at the instructions and you listen to what he said, he didn't intend for anyone to get murdered. He didn't apparently know that he even had gun.

ECF No. 33 at 29; ECF No. 46-28 at 57. Sheffield argues: "The prosecutor apparently tried to suggest to the jury there was some legal instruction or some obvious facts exculpating Rufus Smith in this case. This was prosecutorial misconduct stating facts not in evidence and misstating the law." ECF No. 33 at 29.

Regarding this claim, the Nevada Court of Appeals ruled:

> … Sheffield claimed counsel was ineffective for failing to object to the State arguing about facts that were not in evidence. Sheffield claimed the State improperly discussed a witness's plea agreement, stated the witness's level of involvement with the murder, and argued that the witness's testimony was reasonable. Sheffield failed to demonstrate that these statements were not based on facts presented at trial. The witness testified about his plea agreement at trial and that he did not know Sheffield was going to murder the victim or that Sheffield had a gun. The remainder of the argument by the State was proper argument regarding the credibility and consistency of the testimony from the witnesses. *See Randolph v. State*, 117 Nev. 970, 984, 36 P.3d 424, 433 (2001) ("The State is free to comment on testimony, to express its views on what the evidence shows, and to ask the jury to draw reasonable inferences from the evidence."). Thus, Sheffield failed to demonstrate counsel's performance was deficient for failing to object or a reasonable probability of a different outcome at trial had counsel objected. Therefore, we conclude the district court did not err by denying this claim without first conducting an evidentiary hearing.

ECF No. 43-50 at 6–7.

This ruling, too, was reasonable. Sheffield does not explain how the statement referred to any facts not in evidence. The general statement by the prosecutor, "… when you look at the instructions and you listen to what he said," did not refer to any facts not in evidence, and it did not misstate any jury instruction. And, Sheffield makes no showing of a reasonable probability of a different outcome had counsel objected.

35

The Nevada Court of Appeals' ruling on the claims in Ground 2F was not contrary to, or an unreasonable application of, *Strickland* or any other Supreme Court precedent, and it was not based on an unreasonable determination of the facts in light of the evidence presented.  The Court denies relief on Ground 2F.

**H.    Ground 2G**

In Claim 2G, Sheffield claims that his trial counsel was ineffective because he "fail[ed] to object to the testimony of Dr. Jennifer Corneal." ECF No. 33 at 30–31. Sheffield claims that his trial counsel should have objected to Dr. Corneal's testimony because it violated his federal constitutional right to confrontation, under the Supreme Court's holding in *Crawford v. Washington*, 541 U.S. 36 (2004).  In *Crawford*, the Supreme Court held that, under the Confrontation Clause, out-of-court testimonial statements can be admitted "only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." 541 U.S. at 59.  Sheffield states:

> At trial, the State called Jennifer Corneal to testify as a medical examiner for the Clark County Coroner's Office.  Dr. Corneal testified about an autopsy that had been performed on Jonathan Collins as well as a toxicology report that had been prepared.  However, Dr. Corneal didn't [perform] the autopsy herself, nor did she prepare the toxicology report; instead, Dr. Elaine Olson (who had retired by the time of Sheffield's trial) performed the autopsy and prepared the toxicology report.  There was no evidence to suggest Dr. Olson was unavailable.

ECF No. 33 at 31 (footnotes omitted).

Sheffield did not assert this claim in state court. ECF No. 33 at 30.  His position is that "[t]his claim is new, technically exhausted, and procedurally defaulted, but Sheffield overcomes the default under *Martinez v. Ryan*." *Id*.  In ruling on the motion to dismiss, the Court deferred the question whether Ground 2G is subject to denial as procedurally defaulted. ECF No. 58 at 10–11.

The *Crawford* Court did not define "testimonial," but stated that "it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Crawford*, 541 U.S. at 68.  In *Melendez-Diaz v.*

*Massachusetts*, the Supreme Court determined that a sworn affidavit showing the results of a forensic analysis performed on seized controlled substances was testimonial under *Crawford* because it was created for evidentiary purposes and in aid of a police investigation. 557 U.S. 305, 308–11 (2009).  In *Bullcoming v. New Mexico*, the Supreme Court held that unsworn blood-alcohol reports were testimonial evidence for the same reasons. 564 U.S. 647, 663–66 (2011).

Sheffield points to no authority holding that autopsy reports are testimonial within the meaning of *Crawford*. *See* ECF No. 33 at 30–34; ECF No. 79 at 34–38; *see also Williams v. Illinois*, 567 U.S. 50, 84 (2012) (recognizing that in *Melendez-Diaz* and *Bullcoming* the Supreme Court "did not hold that all forensic reports fall into the same category ... the reports in those cases ran afoul to the Confrontation Clause because they were the equivalent of affidavits made for the purpose of proving the guilt of a particular criminal defendant at trial.").  This undermines Sheffield's claim that his trial counsel was ineffective for not objecting on Confrontation Clause grounds to the testimony of Dr. Corneal, as well as his claim that he was prejudiced by his trial counsel not objecting.

Furthermore, none of Dr. Corneal's testimony was important to the State's case. Kneisl's testimony was strong evidence that Collins was shot at close range.  And the trajectory of the bullet was of little import, because there was no evidence of the exact positions of Collins or the shooter, or the exact angle of the gun, when the fatal shot was fired.  Moreover, Sheffield provides no explanation regarding the importance of the toxicology report; Collins's level of intoxication, if any, was not a significant issue at trial.

Ground 2G is insubstantial.  Sheffield makes no showing under *Martinez* that counsel performed unreasonably in not raising this claim in Sheffield's state habeas action, or that Sheffield was prejudiced.  Ground 2G is denied as procedurally defaulted.

### I.    Ground 2H

In Ground 2H, Sheffield claims that he was prejudiced by the cumulative effect of his trial counsel's errors. ECF No. 33 at 32.  The Court denies relief on this claim.  To

the extent the Court reaches the question of possible prejudice resulting from alleged shortcomings of Sheffield's trial counsel's performance, the Court determines that Sheffield was not prejudiced, and the Court comes to this conclusion whether Sheffield's claims of ineffective assistance of trial counsel are considered individually or cumulatively.

### J.    Sheffield's Motion for Leave to Conduct Discovery

In conjunction with his reply to Respondents' answer, Sheffield filed a motion for leave to conduct discovery. ECF No. 66.  By that motion, Sheffield requests leave to conduct discovery to obtain:

- the pill bottle found at the Cambridge Street apartment, to test it for fingerprints; and

- "a full and complete copy of the State's entire file including any *Brady* materials."

*Id*. at 1, 3, 14.

Rule 6(a) of the Rules Governing Section 2254 Cases in the United States District Courts ("Habeas Rules") provides that "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure ...."  In *Bracy v. Gramley*, 520 U.S. 899 (1997), the Supreme Court held that Rule 6 is to be applied consistently with its prior opinion in *Harris v. Nelson*, 394 U.S. 286 (1969), which called for adoption of the rule. *Bracy*, 520 U.S. at 904, 909.  In *Harris*, the Supreme Court held that "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is ... entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." *Harris*, 394 U.S. at 300.  In *Bracy*, a unanimous Supreme Court overturned a decision denying discovery where the petitioner's claim of judicial bias was based on "only a theory," where the claim was "not supported by any solid evidence" with regard to the theory, and where the Supreme Court expressly noted that "[i]t may well be, as the Court of Appeals predicted, that petitioner will be unable to obtain evidence sufficient to support" the theory. *Bracy*, 520 U.S. at 908–09.  The Ninth

38

Circuit Court of Appeals has held, consistent with *Bracy* and *Harris*, that discovery is available to a habeas petitioner, at the discretion of the district court, where the requested discovery might provide support for a claim. *See*, *e.g.*, *Pham v. Terhune*, 400 F.3d 740, 743 (9th Cir. 2005); *Jones v. Wood*, 114 F.3d 1002, 1009 (9th Cir. 1997).

Sheffield's request for discovery of "a full and complete copy of the State's entire file including any *Brady* materials" is untethered to any claim asserted in his second amended petition. *See* ECF No. 33.  Sheffield does not, in his second amended petition, assert a claim under *Brady v. Maryland*, 373 U.S. 83 (1963), and he does not allege any facts suggesting that any *Brady* material has ever been withheld from him.  And, at any rate, even if any part of this request was related to a particular claim, the request would be wildly overbroad.

As for Sheffield's request for discovery of the pill bottle, for fingerprint testing, as is discussed in Part IVB, *supra*, regarding Ground 2A, Sheffield makes no showing that fingerprint testing of the pill bottle could substantially benefit the defense.

So, the Court determines that Sheffield does not show good cause for the discovery he requests; that is, he does not show that the requested discovery might provide support for any claim asserted in his second amended habeas petition.  The Court therefore denies Sheffield's motion for leave to conduct discovery.

### K.    Certificate of Appealability

This is a final order adverse to Sheffield.  Habeas Rule 11 therefore requires the Court to issue or deny a certificate of appealability.  The standard for the issuance of a certificate of appealability requires a "substantial showing of the denial of a constitutional right." 28 U.S.C. §2253(c).  The Supreme Court has interpreted 28 U.S.C. § 2253(c) as follows:

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.  The issue becomes somewhat more complicated where … the district court dismisses the petition based on procedural grounds.  We hold as follows: When the district court denies a habeas petition on procedural grounds

without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074, 1077–79 (9th Cir. 2000).  Applying the standard articulated in *Slack*, the Court finds that a certificate of appealability is unwarranted.  The Court denies Sheffield a certificate of appealability.

**V.    CONCLUSION**

**IT IS THEREFORE ORDERED** that Petitioner's Motion for Leave to Conduct Discovery (ECF No. 66) is **DENIED**.

**IT IS FURTHER ORDERED** that Petitioner's Second Amended Petition for Writ of Habeas Corpus (ECF No. 33) is **DENIED**.

**IT IS FURTHER ORDERED** that Petitioner is denied a certificate of appealability.

**IT IS FURTHER ORDERED** that the Clerk of the Court is kindly directed to enter judgment accordingly and close this case.

DATED THIS __17__ day of _____March_____, 2026.

_____
GLORIA M. NAVARRO
UNITED STATES DISTRICT JUDGE